933 A.2d 700 (2007)
2007 VT 63
STATE HOUSING AUTHORITY
v.
TOWN OF NORTHFIELD.
The Housing Foundation, Inc.
v.
Town of Northfield.
Nos. 06-086, 06-087.
Supreme Court of Vermont.
July 13, 2007.
*701 Robert A. Gensburg of Gensburg, Atwell & Broderick, St. Johnsbury, for Plaintiffs-Appellees.
Glenn C. Howland and Elizabeth H. MaGill of McKee, Giuliani & Cleveland, Montpelier, for Defendant-Appellant.
Present: REIBER, C.J., DOOLEY, JOHNSON, SKOGLUND and BURGESS, JJ.
¶ 1. SKOGLUND, J.
The Town of Northfield brings these consolidated appeals from decisions by the state appraiser regarding the valuation of two different subsidized housing complexes within the Town. The Town contends that (1) the appraiser erred by applying a statutory amendment that had not yet become effective, (2) the appraiser accepted testimony on behalf of the housing authority in each case without requiring the authority to submit its own appraisal, (3) the appraiser erroneously applied the income approach to value rather than the cost or market approach, (4) the Town was penalized because the listers did not have access to the information they needed to apply the income approach, and (5) the appraiser wrongly relied on unsworn materials to support the base capitalization rate he applied. We affirm.
¶ 2. This appeal concerns two different subsidized housing projects. The first, Green Mountain Apartments, rents twenty one-bedroom apartments to low-income seniors and disabled persons under sections 515 and 521 of the Housing Act of 1949 (codified at 42 U.S.C. §§ 1485, 1490r). It is owned by the Vermont State Housing Authority, a government unit using federal resources to improve low-rent housing conditions in Vermont. Green Mountain Apartments is financed by a fifty-year mortgage through the United States Department of Agriculture (USDA) that cannot be prepaid. Green Mountain Apartments cannot be transferred except to a "qualified entity" which may not be a for-profit company.
¶ 3. The second development, the Dogwood complex, is an affordable housing development that was built in two stages with two different missions. The Dogwood complex is owned by The Housing Foundation, Inc., a wholly owned subsidiary of the Vermont State Housing Authority.[1] Dogwood I, the first part of the project, consists of four two-story apartment buildings totaling thirty-two units. The units are rented pursuant to section 521, and this portion of the project, like the Green Mountain Apartments, is financed with a fifty-year USDA mortgage that cannot be prepaid and carries the same limitations on transfer. Dogwood II operates pursuant to the United States Department of Housing and Urban Development's (HUD) section eight program. The means-testing *702 and maximum rent requirements are similar in all material respects to section 521, but the mortgage requirements differ. The Housing Foundation prepaid the HUD mortgage in 2005. Like Green Mountain Apartments, rents charged at the Dogwood complex cannot exceed 30% of a tenant's household income, 42 U.S.C. § 1437a(a)(1), and they cannot be raised without federal approval. Each year, the government determines the fair market rent for apartments in the area and then pays the difference between the 30% of household income that the tenants pay, and the project's operating costs. Id. § 1437f(c).
¶ 4. In 2004, the Town of Northfield undertook a town-wide reappraisal of its property, and the listers, using the cost approach to value, determined that the grand list value of the Green Mountain Apartments was $1,150,000. They set the grand list value of the Dogwood complex at $2,223,630. The authority appealed both decisions to the Board of Civil Authority, which affirmed the listers' decisions in both cases. The authority appealed again to the director of the division of property valuation and review pursuant to 32 V.S.A. § 4461. The director assigned the state appraiser to hear both appeals. In each appeal, the authority submitted the projects' actual income and expenses for the fiscal year ending on September 30, 2003. The appraiser subtracted the properties' actual expenses from their actual income to determine the net operating income of each complex. In both cases, the state appraiser applied a capitalization rate of 11.76% (a base rate of 9.5% plus the tax rate of 2.26%) to those numbers, and he determined that Green Mountain Apartments' appraised value was $384,600 and the Dogwood complex's appraised value was $1,284,300. The Town appeals.
¶ 5. This Court has held that any valuation method resulting in a rational determination of fair market value will survive scrutiny. See Woolen Mill Assocs. v. City of Winooski, 162 Vt. 461, 464, 648 A.2d 860, 863 (1994). "Where the record contains `some basis in evidence for [the state appraiser's] valuation, the appellant bears the burden of demonstrating that the exercise of discretion was clearly erroneous.'" Vt. Elec. Power Co. v. Town of Vernon, 174 Vt. 471, 475, 807 A.2d 430, 436 (2002) (mem.) (quoting Lake Morey Inn Golf Resort, Ltd. P'ship v. Town of Fairlee, 167 Vt. 245, 248, 704 A.2d 785, 787 (1997)) (alteration in the original).
¶ 6. As noted above, the Town challenges the materials that the appraiser considered on three fronts. First, the Town contends that the appraiser applied a statutory provision, 32 V.S.A. § 3481, that had not yet become effective. Second, the Town argues that the appraiser should have required the authority to submit its own appraisal in each case, and third, the Town challenges the admission in both hearings of a letter upon which the appraiser relied to determine the base capitalization rate.
¶ 7. We first address whether or not the appraiser improperly applied the methods approved in § 3481. Before 2005, towns had various methods for valuing subsidized housing and the low-income housing tax credits provided by section 42 of the Internal Revenue Code. The Town of Manchester had included low-income housing credits in a housing project's appraisal value, and in 2004 the Bennington Superior Court approved Manchester's use of the credits. Manchester Knoll Housing Ltd. P'ship v. Town of Manchester. Docket No. 52-2-02 Bncv (Mar. 31, 2004). The Legislature reacted by imposing a moratorium on the inclusion of tax credits in an affordable housing project's appraisal value. *703 It created a study committee to consider whether the value of federal affordable housing tax credits, I.R.C. § 42, or the Vermont equivalent, 32 V.S.A. § 5930u, should be included in an income-method property tax appraisal. 2003 No. 163 (Adj.Sess.), § 35. After a year of study, and a unanimous report by the study committee, the Legislature imposed an income approach appraisal method with four elements. 32 V.S.A. § 3481(1). The statute requires an appraiser to apply these four elements to determine the fair market value of rental property subject to legal restrictions on rent.[2]Id. The process applies "to grand lists of April 1, 2006, and after." 2005, No. 38, § 22(1).
¶ 8. The Town claims that the appraiser applied the statute retrospectively to the 2004 tax year. We find that he did not. The appraiser did discuss the amendments to the definition of fair market value, and he even went so far as to demonstrate that the results would be the same under the statute as under the process which he used. Nevertheless, the appraiser's method differed in several key ways from the method outlined in the new statute. First, the state appraiser did not use imputed market rents as required by the statute. 32 V.S.A. § 3481(1)(A). The appraiser used actual 2004 revenues from both Green Mountain Apartments and the Dogwood complex. From that actual revenue, he subtracted the actual operating expenses of each unit to determine each unit's net operating income. These actual operating expenses included the actual vacancy rates and credit losses. The statute, by contrast, uses a set vacancy rate. Id. § 3481(1)(C). The appraiser then applied a capitalization rate of 9.5% plus the 2004 Northfield tax rate of 2.26% to the net income to arrive at the appraisal value. This was a classic use of the widely accepted direct capitalization approach to value. See Appraisal Institute, The Appraisal of Real Estate 529 (12th ed. 2001). "Direct Capitalization is a method used in the income capitalization approach to convert a single year's income expectancy into a value indication." Id.
¶ 9. The housing authority concedes that in both cases, the appraiser erred by subtracting the theoretical vacancy and credit losses from each project's actual income. This subtraction was in error because the actual vacancy rate and credit losses were already included in its actual gross income. In each case, this led to a slightly lower appraised value. The appraiser subtracted a theoretical vacancy and credit loss of $2,118 from Green Mountain Apartments' actual gross income of $141,214, thus calculating Green Mountain Apartments' value at $384,660. The *704 authority concedes it should be $402,610. After subtracting $5,421 from the Dogwood complex's net operating income, the appraiser valued the Dogwood complex at $1,284,300; the authority acknowledges that it should be $1,330,400.[3] Though apparently cognizant of the new statute's requirements, the appraiser's methodology was rational and sound. Apart from the above-noted arithmetic, there was no error.
¶ 10. The Town next contends that the authority should have been required to produce an appraisal performed by a third party to rebut the listers' valuation of the properties. A taxpayer must submit admissible evidence to rebut the listers' assessment, but we find no rule that requires an appraisal by a third party in such cases. In general, "[t]he owner of real or personal property shall be a competent witness to testify as to the value thereof." 12 V.S.A. § 1604. This rule applies to corporate entities as well as individuals. O'Bryan Constr. Co. v. Boise Cascade Corp., 139 Vt. 81, 90, 424 A.2d 244, 249 (1980). A designated representative of a corporation is qualified to testify under this section as to the value of corporate property once he has been shown to have a thorough familiarity with that property. Id. The Vermont State Housing Authority's director of property and asset management testified in both cases as to her belief of the appraised value, and offered evidence to support her opinion. During that testimony, the appraiser had ample opportunity to evaluate the director's knowledge of the properties in issue and to make a judgment about her credibility. These are both determinations within the discretion of the hearing officer. See Crabbe v. Veve Assocs., 150 Vt. 53, 58, 549 A.2d 1045, 1049 (1988) (holding that where the evidence of value is conflicting, a determination is properly left up to the fact finder). Therefore, we cannot find error in the appraiser's decision to allow the director to testify as to the value of the two properties.
¶ 11. The Town further argues that the appraiser admitted an advice letter from the Allen and Brooks accounting firm in error. The letter was addressed to the Executive Director of the Vermont Housing Finance Agency and the District Advisor Supervisor of the Property Valuation and Review Division of the Vermont Department of Taxes, and it was unsigned. It is clear from a thorough reading of the transcript that the Allen and Brooks firm was familiar to all the parties because the firm had advised the Legislature during the study committee and on the amendments to the statute. At the beginning of each hearing, the appraiser accepted the letter into evidence with a number of other uncontested exhibits, and the Town did not object to its admission. The appraiser found that the letter's analysis of the capitalization rates provided convincing evidence that the base capitalization rate should be 9.5% for properties with subsidized housing covenants. The Town advocated for an 8.5% to 9.0% capitalization rate, while the authority recommended a rate in the 10% to 12% range. The appraiser appropriately applied a capitalization rate between the figures suggested by both parties.
¶ 12. Finally, the Town complains that the appraiser should not have used the income approach to value because the listers did not have the information necessary for them to conduct such an appraisal. *705 The Town also contends that the appraiser used unreliable data which led to an unreliable appraisal. The fact that the listers did not have the housing authority's actual income and expense numbers will not, by itself, suffice to reverse the appraiser's decision. In the Green Mountain Apartments hearing, the Town's witness stated, "[i]n calculating the value of the property, I would agree that the income approach is the most reliable; again, we didn't have market information at the time." While the Town now characterizes this as a general statement, in the context of a hearing about how to appraise a particular property, it remains a concession. Indeed, a few sentences later the Town's witness discusses the income approach as applied to Green Mountain Apartments. Therefore, the appraiser's conclusion that the Town conceded the income approach, in the Green Mountain Apartments case, was a reasonable conclusion under the circumstances.
¶ 13. The Town is correct that its witness did not make any such concession in the Dogwood hearing. Nevertheless, the appraiser has the discretion to correct the listers' valuation if he determines that the method used was not the one most appropriate for the type of property at issue. Vt. Elec. Power Co., 174 Vt. at 475, 807 A.2d at 436.
¶ 14. Using the cost approach to value, the Town had set the Dogwood complex's value at $2,223,600, a value consistent with a typical cost-approach analysis. As applied to a low-income housing project, however, this approach makes no sense. The record shows that the Dogwood complex does not produce any cash or other economic reward to the owner, and it will not, at least until the section 515 mortgage is paid off twenty years from now. The appraisal value is supposed to reflect the price that the property would bring if offered on the open market. 32 V.S.A. § 3481(1). The Dogwood complex will not bring $2,223,600 on the open market, and Green Mountain Apartments will not bring anywhere near the $1,150,000 value set by the Town because of these restrictions. Section 515 housing projects can be sold only to other tax-exempt organizations who are willing to abide by the rent and mortgage restrictions currently in place.
¶ 15. Similarly the market approach to value has no application in this case. In the market approach, the appraiser finds similar properties that have been sold recently, and extrapolates a value for the subject property by comparing it to those recent sales. See Lake Morey Inn Golf Resort, Ltd. P'ship, 167 Vt. at 249, 704 A.2d at, 787-88 (describing the "market data approach"). There is no real market for section 515 housing projects because they can be sold only to other tax-exempt organizations that, by definition, make no profit. The Town did not produce any evidence of any similar sales, and all parties concede there have been none. For this reason, comparing the projects to similar properties recently sold on the open market is to no avail.
¶ 16. The record is replete with evidence from which the appraiser could have reasonably come to his conclusions. We remand solely for the appraiser to correct the arithmetic regarding the actual vacancy and credit loss rate. In all other respects we affirm.
Affirmed in part and remanded for the appraiser to correct the arithmetic regarding the actual vacancy and credit loss rate.
NOTES
[1] For purposes of this appeal, both the Vermont State Housing Authority and the Housing Foundation, Inc., will be referred to as "the authority."
[2] The statute reads in relevant part:

For residential rental property that is subject to a housing subsidy covenant or other legal restriction, imposed by a governmental, quasi-governmental, or public purpose entity, on rents that may be charged, fair market value shall be determined by an income approach using the following elements:
(A) market rents with utility allowance adjustments for the geographic area in which the property is located as determined by the federal office of Housing and Urban Development;
(B) actual expenses incurred with respect to the property as provided by the property owner and certified by an independent third party;
(C) a vacancy rate that is 50 percent of the market vacancy rate as determined by the United States Census Bureau with local review by the Vermont housing finance agency; and
(D) a capitalization rate that is typical for the geographic area determined and published annually prior to April 1 by the division of property valuation and review after consultation with the Vermont housing finance agency.
32 V.S.A. § 3481(1).
[3] This is a matter of simple arithmetic. The Court will remand to the appraiser for the sole purpose of correcting the arithmetic.