State Housing Authority v. Town of Northfield (2006-086 & 2006-087)

2007 VT 63

[Filed 13-Jul-2007]


 NOTICE: This opinion is subject to motions for reargument under
 V.R.A.P. 40 as well as formal revision before publication in the Vermont
 Reports. Readers are requested to notify the Reporter of Decisions,
 Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801 of
 any errors in order that corrections may be made before this opinion goes
 to press.

 
 2007 VT 63

 Nos. 2006-086 & 2006-087


 State Housing Authority Supreme Court

 On Appeal from
 v. Property Valuation and Review 
 Division

 Town of Northfield March Term, 2007


 The Housing Foundation, Inc.

 v.

 Town of Northfield


 Merle R. Van Gieson, State Appraiser

 Robert A. Gensburg of Gensburg, Atwell & Broderick, St. Johnsbury, for
 Plaintiffs-Appellees.

 Glenn C. Howland and Elizabeth H. MaGill of McKee, Giuliani & Cleveland,
 Montpelier, for Defendant-Appellant.


 PRESENT: Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.

 
 ¶ 1. SKOGLUND, J. The Town of Northfield brings these
 consolidated appeals from decisions by the state appraiser regarding the
 valuation of two different subsidized housing complexes within the Town. 
 The Town contends that (1) the appraiser erred by applying a statutory
 amendment that had not yet become effective, (2) the appraiser accepted
 testimony on behalf of the housing authority in each case without requiring
 the authority to submit its own appraisal, (3) the appraiser erroneously
 applied the income approach to value rather than the cost or market
 approach, (4) the Town was penalized because the listers did not have
 access to the information they needed to apply the income approach, and (5)
 the appraiser wrongly relied on unsworn materials to support the base
 capitalization rate he applied. We affirm.

 ¶ 2. This appeal concerns two different subsidized housing projects. 
 The first, Green Mountain Apartments, rents twenty one-bedroom apartments
 to low-income seniors and disabled persons under sections 515 and 521 of
 the Housing Act of 1949 (codified at 42 U.S.C. §§ 1485, 1490r). It is
 owned by the Vermont State Housing Authority, a government unit using
 federal resources to improve low rent housing conditions in Vermont. Green
 Mountain Apartments is financed by a fifty-year mortgage through the United
 States Department of Agriculture (USDA) that cannot be prepaid. Green
 Mountain Apartments cannot be transferred except to a "qualified entity"
 which may not be a for-profit company. 
 
 ¶ 3. The second development, the Dogwood complex, is an affordable
 housing development that was built in two stages with two different
 missions. The Dogwood complex is owned by The Housing Foundation, Inc., a
 wholly owned subsidiary of the Vermont State Housing Authority. (FN1) 
 Dogwood I, the first part of the project, consists of four two story
 apartment buildings totaling thirty two units. The units are rented
 pursuant to section 521, and this portion of the project, like the Green
 Mountain Apartments, is financed with a fifty-year USDA mortgage that
 cannot be prepaid and carries the same limitations on transfer. Dogwood II
 operates pursuant to the United States Department of Housing and Urban
 Development's (HUD) section eight program. The means-testing and maximum
 rent requirements are similar in all material respects to section 521, but
 the mortgage requirements differ. The Housing Foundation prepaid the HUD
 mortgage in 2005. Like Green Mountain Apartments, rents charged at the
 Dogwood complex cannot exceed 30% of a tenant's household income, 42 U.S.C.
 § 1437a(a)(1), and they cannot be raised without federal approval. Each
 year, the government determines the fair market rent for apartments in the
 area and then pays the difference between the 30% of household income that
 the tenants pay, and the project's operating costs. Id. § 1437f(c). 

 ¶ 4. In 2004, the Town of Northfield undertook a town wide
 reappraisal of its property, and the listers, using the cost approach to
 value, determined that the grand list value of the Green Mountain
 Apartments was $1,150,000. They set the grand list value of the Dogwood
 complex at $2,223,630. The authority appealed both decisions to the Board
 of Civil Authority which affirmed the listers' decisions in both cases. 
 The authority appealed again to the director of the division of property
 valuation and review pursuant to 32 V.S.A. § 4461. The director assigned
 the state appraiser to hear both appeals. In each appeal, the authority
 submitted the projects' actual income and expenses for the fiscal year
 ending on September 30, 2003. The appraiser subtracted the properties'
 actual expenses from their actual income to determine the net operating
 income of each complex. In both cases, the state appraiser applied a
 capitalization rate of 11.76% (a base rate of 9.5% plus the tax rate of
 2.26%) to those numbers, and he determined that Green Mountain Apartments'
 appraised value was $384,600 and the Dogwood complex's appraised value was
 $1,284,300. The Town appeals.
 
 ¶ 5. This Court has held that any valuation method resulting in a
 rational determination of fair market value will survive scrutiny. See
 Woolen Mill Assocs. v. City of Winooski, 162 Vt. 461, 464, 648 A.2d 860,
 863 (1994). "Where the record contains 'some basis in evidence for [the
 state appraiser's] valuation, the appellant bears the burden of
 demonstrating that the exercise of discretion was clearly erroneous.' " 
 Vt. Elec. Power Co. v. Town of Vernon, 174 Vt. 471, 475, 807 A.2d 430, 436
 (2002) (mem.) (quoting Lake Morey Inn Golf Resort, Ltd. P'ship v. Town of
 Fairlee, 167 Vt. 245, 248, 704 A.2d 785, 787 (1997)) (alteration in the
 original).

 ¶ 6. As noted above, the Town challenges the materials that the
 appraiser considered on three fronts. First, the Town contends that the
 appraiser applied a statutory provision, 32 V.S.A. § 3481, that had not yet
 become effective. Second, the Town argues that the appraiser should have
 required the authority to submit its own appraisal in each case, and third,
 the Town challenges the admission in both hearings of a letter upon which
 the appraiser relied to determine the base capitalization rate. 

 ¶ 7. We first address whether or not the appraiser improperly
 applied the methods approved in § 3481. Before 2005, towns had various
 methods for valuing subsidized housing and the low-income housing tax
 credits provided by section 42 of the Internal Revenue Code. The Town of
 Manchester had included low-income housing credits in a housing project's
 appraisal value, and in 2004 the Bennington Superior Court approved
 Manchester's use of the credits. Manchester Knoll Housing Ltd. P'ship v.
 Town of Manchester, Docket No. 52-2-02 Bncv (Mar. 31, 2004). The
 Legislature reacted by imposing a moratorium on the inclusion of tax
 credits in an affordable housing project's appraisal value. It created a
 study committee to consider whether the value of federal affordable housing
 tax credits, I.R.C. § 42, or the Vermont equivalent, 32 V.S.A.§ 5930u,
 should be included in an income-method property tax appraisal. 2003 No.
 163 (Adj. Sess.) § 35. After a year of study, and a unanimous report by
 the study committee, the Legislature imposed an income approach appraisal
 method with four elements. 32 V.S.A. § 3481(1). The statute requires an
 appraiser to apply these four elements to determine the fair market value
 of rental property subject to legal restrictions on rent. (FN2) Id. The
 process applies "to grand lists of April 1, 2006, and after." 2005, No.
 38, § 22(1). 
 
 ¶ 8. The town claims that the appraiser applied the statute
 retrospectively to the 2004 tax year. We find that he did not. The
 appraiser did discuss the amendments to the definition of fair market
 value, and he even went so far as to demonstrate that the results would be
 the same under the statute as under the process which he used. 
 Nevertheless, the appraiser's method differed in several key ways from the
 method outlined in the new statute. First, the state appraiser did not use
 imputed market rents as required by the statute. 32 V.S.A. § 3481(1)(A). 
 The appraiser used actual 2004 revenues from both Green Mountain Apartments
 and the Dogwood complex. From that actual revenue, he subtracted the
 actual operating expenses of each unit to determine each unit's net
 operating income. These actual operating expenses included the actual
 vacancy rates and credit losses. The statute, by contrast, uses a set
 vacancy rate. Id. § 3281(1)(C). The appraiser then applied a
 capitalization rate of 9.5% plus the 2004 Northfield tax rate of 2.26% to
 the net income to arrive at the appraisal value. This was a classic use of
 the widely accepted direct capitalization approach to value. See Appraisal
 Institute, The Appraisal of Real Estate 529 (12th ed. 2001). "Direct
 Capitalization is a method used in the income capitalization approach to
 convert a single year's income expectancy into a value indication." Id. 

 ¶ 9. The housing authority concedes that in both cases, the
 appraiser erred by subtracting the theoretical vacancy and credit losses
 from each project's actual income. This subtraction was in error because
 the actual vacancy rate and credit losses were already included in its
 actual gross income. In each case, this led to a slightly lower appraised
 value. The appraiser subtracted a theoretical vacancy and credit loss of
 $2,118 from Green Mountain Apartments' actual gross income of $141,214,
 thus calculating Green Mountain Apartments' value at $384,660. The
 authority concedes it should be $402,610. After subtracting $5,421 from
 the Dogwood complex's net operating income, the appraiser valued the
 Dogwood complex at $1,284,300; the authority acknowledges that it should be
 $1,330,400. (FN3) Though apparently cognizant of the new statute's
 requirements, the appraiser's methodology was rational and sound. Apart
 from the above-noted arithmetic, there was no error.

 ¶ 10. The Town next contends that the authority should have been
 required to produce an appraisal performed by a third party to rebut the
 listers' valuation of the properties. A taxpayer must submit admissible
 evidence to rebut the listers' assessment, but we find no rule that
 requires an appraisal by a third party in such cases. In general, "[t]he
 owner of real or personal property shall be a competent witness to testify
 as to the value thereof." 12 V.S.A. § 1604. This rule applies to
 corporate entities as well as individuals. O'Bryan Constr. Co. v. Boise
 Cascade Corp., 139 Vt. 81, 90, 424 A.2d 244, 249 (1980). A designated
 representative of a corporation is qualified to testify under this section
 as to the value of corporate property once he has been shown to have a
 thorough familiarity with that property. Id. The Vermont State Housing
 Authority's director of property and asset management testified in both
 cases as to her belief of the appraised value, and offered evidence to
 support her opinion. During that testimony, the appraiser had ample
 opportunity to evaluate the director's knowledge of the properties in issue
 and to make a judgment about her credibility. These are both
 determinations within the discretion of the hearing officer. See Crabbe v.
 Veve Assocs., 150 Vt. 53, 58, 549 A.2d 1045, 1049 (1988) (holding that
 where the evidence of value is conflicting, a determination is properly
 left up to the fact finder). Therefore, we cannot find error in the
 appraiser's decision to allow the director to testify as to the value of
 the two properties. 
 
 ¶ 11. The Town further argues that the appraiser admitted an advice
 letter from the Allen and Brooks accounting firm in error. The letter was
 addressed to the Executive Director of the Vermont Housing Finance Agency
 and the District Advisor Supervisor of the Property Valuation and Review
 Division of the Vermont Department of Taxes, and it was unsigned. It is
 clear from a thorough reading of the transcript that the Allen and Brooks
 firm was familiar to all the parties because the firm had advised the
 Legislature during the study committee and on the amendments to the
 statute. At the beginning of each hearing, the appraiser accepted the
 letter into evidence with a number of other uncontested exhibits, and the
 Town did not object to its admission. The appraiser found that the
 letter's analysis of the capitalization rates provided convincing evidence
 that the base capitalization rate should be 9.5% for properties with
 subsidized housing covenants. The Town advocated for an 8.5% to 9.0%
 capitalization rate, while the authority recommended a rate in the 10% to
 12% range. The appraiser appropriately applied a capitalization rate
 between the figures suggested by both parties. 
 
 ¶ 12. Finally, the Town complains that the appraiser should not
 have used the income approach to value because the listers did not have the
 information necessary for them to conduct such an appraisal. The Town also
 contends that the appraiser used unreliable data which led to an unreliable
 appraisal. The fact that the listers did not have the housing authority's
 actual income and expense numbers will not, by itself, suffice to reverse
 the appraiser's decision. In the Green Mountain Apartments hearing, the
 Town's witness stated, "[i]n calculating the value of the property, I would
 agree that the income approach is the most reliable; again, we didn't have
 market information at the time." While the Town now characterizes this as
 a general statement, in the context of a hearing about how to appraise a
 particular property, it remains a concession. Indeed, a few sentences
 later the Town's witness discusses the income approach as applied to Green
 Mountain Apartments. Therefore, the appraiser's conclusion that the Town
 conceded the income approach, in the Green Mountain Apartments case, was a
 reasonable conclusion under the circumstances. 

 ¶ 13. The Town is correct that its witness did not make any such
 concession in the Dogwood hearing. Nevertheless, the appraiser has the
 discretion to correct the listers' valuation if he determines that the
 method used was not the one most appropriate for the type of property at
 issue. Vt. Elec. Power Co., 174 Vt. at 475, 807 A.2d at 436. 

 ¶ 14. Using the cost approach to value, the Town had set the Dogwood
 complex's value at $2,223,600, a value consistent with a typical
 cost-approach analysis. As applied to a low-income housing project,
 however, this approach makes no sense. The record shows that the Dogwood
 complex does not produce any cash or other economic reward to the owner,
 and it will not, at least until the section 515 mortgage is paid off twenty
 years from now. The appraisal value is supposed to reflect the price that
 the property would bring if offered on the open market. 32 V.S.A. §
 3481(1). The Dogwood complex will not bring $2,223,600 on the open market,
 and Green Mountain Apartments will not bring anywhere near the $1,150,000
 value set by the Town because of these restrictions. Section 515 housing
 projects can be sold only to other tax-exempt organizations who are willing
 to abide by the rent and mortgage restrictions currently in place. 
 
 ¶ 15. Similarly the market approach to value has no application in
 this case. In the market approach, the appraiser finds similar properties
 that have been sold recently, and extrapolates a value for the subject
 property by comparing it to those recent sales. See Lake Morey Inn Golf
 Resort Ltd. P-ship v. Town of Fairlee, 167 Vt. 245, 249, 704 A.2d 785,
 787-88 (1997) (describing the "market data approach"). There is no real
 market for section 515 housing projects because they can be sold only to
 other tax exempt organizations that, by definition, make no profit. The
 Town did not produce any evidence of any similar sales, and all parties
 concede there have been none. For this reason, comparing the projects to
 similar properties recently sold on the open market is to no avail. 

 ¶ 16. The record is replete with evidence from which the appraiser
 could have reasonably come to his conclusions. We remand solely for the
 appraiser to correct the arithmetic regarding the actual vacancy and credit
 loss rate. In all other respects we affirm.

 Affirmed in part and remanded for the appraiser to correct the
 arithmetic regarding the actual vacancy and credit loss rate.



 FOR THE COURT:



 _______________________________________
 Associate Justice


------------------------------------------------------------------------------
 Footnotes


FN1. For purposes of this appeal, both the Vermont State Housing Authority
 and the Housing Foundation, Inc., will be referred to as "the authority."

FN2. The statute reads in relevant part:

 For residential rental property that is subject to a housing subsidy
 covenant or other legal restriction, imposed by a governmental,
 quasi-governmental, or public purpose entity, on rents that may be charged,
 fair market value shall be determined by an income approach using the
 following elements:

 (A) market rents with utility allowance adjustments for the
 geographic area in which the property is located as determined by
 the federal office of Housing and Urban Development;

 (B) actual expenses incurred with respect to the property as
 provided by the property owner and certified by an independent
 third party;

 (C) a vacancy rate that is 50 percent of the market vacancy rate
 as determined by the United States Census Bureau with local review
 by the Vermont housing finance agency; and

 (D) a capitalization rate that is typical for the geographic area
 determined and published annually prior to April 1 by the division
 of property valuation and review after consultation with the
 Vermont housing finance agency.

 32 V.S.A.§ 3481(1)

FN3. This is a matter of simple arithmetic. The Court will remand to the
 appraiser for the sole purpose of correcting the arithmetic.