### Jack Bowen and Glenda Bowen v. Town of Burke

[569 A.2d 452]

No. 88-611

Present: **Allen, C.J., Peck, Gibson, Dooley and Morse, JJ.**

Opinion Filed October 20, 1989
Motion for Reargument Denied November 15, 1989

*Jack and Glenda Bowen*, pro se, St. Petersburg, Florida, Plaintiffs-Appellants.

*Charles D. Hickey*, St. Johnsbury, for Defendant-Appellee.

### Entry Order

Dooley, J., concurring. I concur in the Court's order in this matter because taxpayer in this property tax appeal raised issues related only to the fair market value of the comparable properties used by the Vermont State Board of Appraisers and the fair market value of the property involved in the appeal. Taxpayer did not demonstrate that the State Board abused its discretion simply because it questioned the Board's methods.

See *Sondergeld v. Town of Hubbardton*, 150 Vt. 565, 568, 556 A.2d 64, 66 (1988).

I cannot let this case pass, however, without comment on the equalization decision. It shows that our equalization rules, as implemented in the appeals panels, are about as rational as rolling dice. The Board considered two properties (labeled #1 and #2) as comparable to the subject property. It established the fair market value and listed value of the properties as follows:

|      | FMV      | Listed Value | Ratio |
|------|----------|--------------|-------|
| #1   | $60,494  | $24,480      | 40%   |
| #2   | $12,000  | $22,506      | 187%  |

It averaged the ratios and reached a result of 113.5%. Since the highest ratio usable for equalization is 100%, the Board set the ratio at 100%. See *Brown v. Town of Windsor*, 139 Vt. 129, 131, 422 A.2d 1268, 1269 (1980).

I doubt anyone seriously believes that the above calculation shows that, on average, properties within the Town, or properties within the Town of a type similar to taxpayer's property, are assessed at 113.5% of fair market value. More importantly, I deem it almost certain that the taxpayers within the Town don't believe that properties generally, or properties similar to taxpayer's property, are assessed at 113.5% of fair market value. Such a belief would surely lead to a taxpayer revolt which would produce a change of local government. Yet, under our precedents, we would probably affirm the equalization decision in this case if the taxpayer attacked it. It doesn't clearly violate any of the rules we have established for the equalization process.[1]

We have held that once the fair market value of the property in question is determined, the second step of the process is to equalize the property valuation with others "to insure compara-

---

[1] It is possible that we could hold that the two properties are not really "comparable" to the taxpayer's property. The land value of one "comparable" property was $4,032 per acre; the land value of the other was $545 per acre. The Board adjusted the values for size, time, topography, access and deed restrictions and produced adjusted values of $2,419 per acre for the first property and $790 per acre for the second property. The difference in per acre value is so great that it is likely that other factors are involved, so comparison is dangerous.

ble listing with other corresponding properties." *Kachadorian v. Town of Woodstock*, 149 Vt. 446, 447, 545 A.2d 509, 510 (1988). Equalization reflects that it is impossible to appraise all property in a town at fair market value each year. See *Alexander v. Town of Barton*, 152 Vt. 148, 155–56, 565 A.2d 1294, 1298 (1989). In a volatile real estate market where values are increasing rapidly—the norm in many parts of this state in the last few years—appraisal cannot keep up with increases in value. Appraisal is far from an exact science. Most towns use volunteer listers who do not have the time and resources to revalue properties each year.

Given that appraisals in many instances will not be equal to fair market value (usually lower), we must ensure that a taxpayer whose appeal is before the Board, and this Court, does not pay a higher percentage of fair market value than others in the town. Here, we are implementing a constitutional command of uniformity and equality of taxation. See *id.* at 157, 565 A.2d at 1299. We must, however, define the "others" to whom we can compare.

The reality is that in every town there are properties that are greatly under or over assessed, whether because of human error, changing property values or other reasons. To say that every taxpayer is entitled to the most advantageous ratio of listed value to fair market value existing within the town, or existing for properties of the same class[2] within the town, is to destroy the property tax system because virtually every appraisal within the town will be unlawful. The goal of fair tax assessment must be to minimize or eliminate valuation errors, not to give them to every taxpayer.

Thus, the equalization comparison must be to an average for some or all taxpayers within the town. For purposes of this opinion, it is sufficient to accept that the comparison might be made in more than one way. Because of the acceptability of

---

[2] Although we have recently upheld property tax classification under the Vermont Constitution, *In re One Church Street*, 152 Vt. 260, 565 A.2d 1349 (1989), the concept of a class of property is undeveloped in our law. For purposes of this discussion, I use the term "class" as a synonym for type of property—for example, residential property.

property tax classification either directly as in *In re One Church Street*, 152 Vt. 260, 565 A.2d 1349 (1989), or indirectly through legitimate appraisal methods as in *Alexander v. Town of Barton*, it may be that the comparison should be with an average of properties within the same class as the property involved in the appeal.

If our current rules produce an equalization ratio equal to the average of the ratios for other properties in the town, it is only by pure accident. There are two main reasons why our methods don't lead to acceptable results.

The first reason is that our precedents require the derivation of an equalization ratio only from comparable properties. The term "comparable properties" is contained in the governing statute, 32 V.S.A. § 4467, and we have assumed it has the same meaning as it does in determining fair market value. I believe this construction is wrong.

Comparable properties are used in the most common method of finding fair market value. That method—the comparative sales approach—involves analyzing the sales prices of comparable properties to derive a price that the property being appraised would bring if sold in the open market. See International Ass'n of Assessing Officers, *Property Assessment Valuation* 105 (1977). The method works only if the properties involved are so similar that they are "comparable." This notion of similarity is defined well in § 1108 of the Uniform Eminent Domain Code, drafted by the National Conference of Commissioners on Uniform State Laws, which reads:

> [A] valuation witness . . . may consider the price and other terms and circumstances of any good faith sale or contract to sell and purchase comparable property . . . [if] the property is sufficiently similar in the relevant market, with respect to situation, usability, improvements, and other characteristics, to warrant a reasonable belief that it is comparable to the property being valued.

Uniform Eminent Domain Code § 1108, 13 U.L.A. 108 (1986).

The problem is that comparability has nothing to do with equalization. If, for example, we determine that steep, wooded lots are not "comparable" to flat, meadow lots, that does not

mean that it is acceptable to assess one kind of lot at 40% of fair market value and the other at 60% of fair market value.

This issue has been analyzed fully and persuasively by the Pennsylvania Supreme Court, who in *McKnight Shopping Center v. Board of Property Assessment*, 417 Pa. 234, 209 A.2d 389 (1965), held that all properties within the municipality, not only those found to be comparable, must be used in determining equalization. The court stated:

> [O]nce the relevant factors are applied and market values are determined, the ratio of the assessed values to these market values must be uniform throughout the taxing district. Thus, in determining uniformity the ratios of assessed values to market values of all properties are all relevant, and hence, in that sense all properties are "comparables."
>
> , This is different from the meaning of "comparables" in determining the market value of a specific property. In this context, as one of the factors to be considered in determining market value, "comparables" means properties of a similar nature which have been recently sold. . . . In reviewing sales of other properties, "to compare" means to examine the characters or qualities of one or more properties for the purpose of discovering their resemblances or differences. The aim is to show relative values by bringing out characteristic qualities, whether similar or divergent. Thus, comparisons based on sales may be made according to location, age and condition of improvements, income and expense, use, size, type of construction and in numerous other ways.
>
> In considering whether or not a particular assessment is lacking in uniformity, however, a property owner, the taxing authority and the courts may rely on any relevant evidence.

Id. at 240–42, 209 A.2d at 392–93 (citations omitted). I see no reason why we can't adopt the Pennsylvania analysis in this state.

The second reason is that the comparison is actually made with only a few properties which may or may not be representa-

tive of all "comparables." None of our cases involve more than a few properties and none require a minimum number for comparison purposes. The number is actually chosen by the parties as they decide what evidence to submit. Presumably, the taxpayer submits evidence on properties where the assessed value is a small percentage of fair market value and the town submits evidence on properties where the assessed value is greater than (or a high percentage of) fair market value.

With an extraordinarily small sample, there is little likelihood that the average of the ratios of the properties is equal or close to the average of all ratios or the average of the ratios for properties within the class. Moreover, every case creates a new ratio. If this taxpayer's neighbor appeals and finds two more properties with 40% ratios, the equalization ratio for his property will be approximately 75%. It is wholly irrational for adjoining, similar properties to have different equalization ratios.

The distortion caused by minute samples is exacerbated by the loose manner in which the term "comparable" is applied. None of our decisions define "comparable properties," and we have never overturned a Board determination that a property is comparable. In fact, as shown by this case, it is doubtful whether many of the properties used in equalization meet any definition of "comparable properties." In this case, the per acre values of the "comparable properties" were $4,032 per acre for property #1 and $545 per acre for property #2. It is hard to believe that these properties are sufficiently similar to be comparable if one is worth eight times as much per acre as the other.

When the definition of comparable property is loose, there are no constraints on the parties in finding and using properties with low (taxpayer) or high (town) ratios. The lack of constraints makes it less likely that the ratios of the properties submitted are representative of all properties or a class of properties.

In theory, this Court could address the small and unrepresentative sample problem by requiring evidence on every compara-

ble property or a statistically representative sample.[3] In practice, the evidence is unavailable. While our precedents talk about the difference between the listed value and fair market value of comparable properties, the concept of comparable properties is applicable only where there is a sale of the properties involved. In smaller communities, there may be few or no sales of comparable properties. This paucity of comparative data ensures an unrepresentative sample, or no comparison at all.

There are alternatives to the current system. Some, but not all, would require legislative action. One solution that does not is to use equalization data produced annually by the Commissioner of Taxes under 16 V.S.A. § 3458a(a). Those data are generated each January 1st for the listings made in the preceding April and are broken down by type of property. Use of the Tax Commissioner's data and determinations would meet three major needs of the process: (1) the data are objectively determined by an independent third party; (2) they are based on the largest sample possible and, thus, are as accurate as possible; and (3) they don't vary from case to case. Use of these data also comports with the requirement of 32 V.S.A. § 4467 setting listed value at a value corresponding to that of comparable properties within the town. The only drawback to relying on the Commissioner's data is that it may delay Board decisions somewhat. For example, the hearing and decision in this case occurred in November of 1988 for the 1988 taxes. The Board would have had to delay two months to use the Commissioner's data.

I have written at length in this case because I, for one, don't intend in the future to endorse property valuation decisions arrived at by dice-throwing. This case shows the absurd results that are possible under our dice-throwing method. While it would be preferable for the Legislature to bring about reform, this Court must act in the absence of legislative action if the constitutional command of uniformity of taxation is to be honored.

---

[3] For purposes of discussion, I am assuming that the production of a statistically valid sample could be done without greatly increasing the cost and formality of property tax appeals. I doubt this assumption is valid.