2008 VT 41

**John W. Dewey and Morella L. Dewey v. Town of Waitsfield**

[956 A.2d 508]

Nos. 06-068 & 06-527

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed April 11, 2008

Motion for Reargument Denied May 8, 2008

*Allan R. Keyes* of *Ryan, Smith & Carbine, Ltd.*, Rutland, and *Richard W. Darby* of *Darby, Stearns, Thorndike, Kolter & Ware, LLP*, Waterbury, for Plaintiffs-Appellants (06-068) Plaintiffs-Appellees (06-527).

*Robert E. Fletcher* of *Stitzel, Page & Fletcher, P.C.*, Burlington, for Defendant-Appellee (06-068) Defendant-Appellant (06-527).

¶ 1. **Burgess, J.** In these consolidated property tax appeals, we consider the listed value of taxpayers' property as of April 1, 2002 and April 1, 2005. In the first appeal, taxpayers challenge the superior court's decision to list their property at $1,329,000 as of April 1, 2002. In the second appeal, the Town challenges the state appraiser's decision to list taxpayers' property at $848,500 as of

April 1, 2005. At issue in both appeals is the calculation of an appropriate equalization ratio. Taxpayers also challenge the superior court's assessment of the fair market value of their property. As discussed below, we reverse and remand the superior court's decision for the recalculation of an equalization ratio, and we remand the decision of the state appraiser for additional findings.

¶ 2. Before turning to the facts, we briefly review general principles applicable to both cases. Property tax appeals are considered de novo by either the superior court or the state appraiser. 32 V.S.A. § 4467. These tribunals are charged with determining the correct valuation of property and ensuring that the listed value of property corresponds to the listed value of comparable properties within the town. *Id.* This is a two-step process. First, the fair market value (FMV) of the property is ascertained. Next, this value is " 'equalized' to insure that the property is listed comparably to corresponding properties in town." *Kachadorian v. Town of Woodstock*, 144 Vt. 348, 350, 477 A.2d 965, 967 (1984) (citations omitted). Equalization is necessary because we recognize that a town cannot feasibly list all property at its FMV every year, particularly in a rising real-estate market. *Allen v. Town of W. Windsor*, 2004 VT 51, ¶ 2, 177 Vt. 1, 852 A.2d 627. Thus, we have held that a difference between listed and fair market values of real property is permissible as "long as the ratio between listed and fair market values is consistent among properties." *Id.* (explaining that need for uniformity derives from constitutional command that "no taxpayer pays a disproportionate share of the public tax burden"). "The burden of persuading the trier of fact that his property is over-assessed, which is the underlying issue, remains with the taxpayer throughout the entire proceeding." *Kruse v. Town of Westford*, 145 Vt. 368, 372, 488 A.2d 770, 773 (1985); see also *New England Power Co. v. Town of Barnet*, 134 Vt. 498, 508, 367 A.2d 1363, 1369 (1976) ("It is to be emphasized . . . that the burden of persuasion as to the contested issues in a § 4467 hearing remains at all times with the taxpayer.").

¶ 3. On review by this Court, the decision by the state appraiser "will be deemed presumptively correct and its findings will be conclusive if they are supported by the evidence." *Lake Morey Inn Golf Resort, Ltd. P'ship v. Town of Fairlee*, 167 Vt. 245, 248, 704 A.2d 785, 787 (1997). In a similar vein, we will not set aside the trial court's findings of fact unless they are clearly erroneous,

V.R.C.P. 52(a)(2), and we will affirm its conclusions where they are reasonably drawn from the evidence presented. See, e.g., *Harte v. Town of Bennington*, 153 Vt. 256, 258, 571 A.2d 53, 54 (1989).

¶ 4. With this in mind, we turn to the facts. In 1994, taxpayers purchased seventy acres of real property in Waitsfield for $660,000. The property is improved by a large well-constructed home with an attached three-car garage and small apartment. There is a sizeable pond on the property, attractive landscaping, fenced riding and pasture areas, as well as exceptional views of the entire Lincoln Mountain range. The property was assessed at $670,700 as of April 1, 1996 after a town-wide reappraisal.

¶ 5. In 2000, taxpayers added a 10,536 square foot two-story horse barn to their property. The barn has the same architectural appearance and exterior finish as the dwelling house; it is similarly well-constructed and in excellent condition. The barn contains stables, a hay loft, work and storage areas, an office, a tack room, and a one-bedroom apartment. The construction of the barn triggered a reappraisal, and the property was subsequently listed at $1,394,600 as of April 1, 2001. Taxpayers did not timely appeal from this assessment.

¶ 6. The property was listed at the same value in 2002, and taxpayers grieved this assessment. The listers reduced the assessed value to $1,151,600, and taxpayers appealed to the board of civil authority (BCA). The BCA denied the appeal and upheld the value set by the listers. It found the FMV of the property to be $1,300,000 as of April 1, 2002, and it applied an equalization ratio (ER) of 88.6%, taken from the State of Vermont's "common level of appraisal" (CLA) for all properties in Waitsfield as determined by the Division of Property Valuation and Review (PVR) of the Vermont Department of Taxes as of December 2001 (2001 CLA).[1]

---

[1] Each year, the Department of Taxes conducts an "equalization" study, the purpose of which is to estimate the full fair market value of all property that is taxable for education purposes and to determine the level of assessment equity (coefficient of dispersion). See Introduction to Vermont's Equalization Study, Vermont Dep't of Taxes, Division of Property Valuation and Review (Dec. 2004), available at http://www.state.vt.us/tax/pvr.shtml. As the Department explains, the state assesses a tax to fund education costs based on the grand lists compiled by the listers in over 250 municipalities in the state. While the listers are required to list all taxable property each year at its fair market value, it is not feasible to do so given the ever-changing real estate market and because town-wide reappraisals are not conducted annually. Thus, to treat all municipalities equally, the Department must bring grand lists to fair market value. Fair market value is the price

¶ 7. Taxpayers appealed this decision to the superior court in August 2002. Trial was postponed several times at the parties' request, and the case was ultimately decided in September 2005. The court first determined that the FMV of the property was $1,500,000, relying on testimony offered by the Town's expert, Spencer Potter. Mr. Potter used the "sales comparison" or "market" method and identified two comparable sales, which he described in detail. The court agreed that these two properties were comparables, and that they provided the best data available as to FMV. It found the evidence of FMV offered by taxpayers' expert, Thomas Vickery, unpersuasive.

¶ 8. Having established FMV, the court turned next to determining an appropriate ER. Taxpayers argued that the court should not use the 2001 CLA of 88.6%, but rather, it should adopt one of the lower equalization ratios (59.85% or 66.35%) developed by Mr. Vickery. The court was not convinced, however, that Mr. Vickery had been consistent in his calculation and application of proper ERs. More importantly, the court continued, it agreed with the Town that the town-wide ER was more appropriate in this case because it reduced the potential for disparate treatment among taxpayers, and it offered the broadest possible equity within the town and the state. Thus, presented with a choice between the broad-based 2001 CLA and the ratios calculated by taxpayers, the court found the use of the CLA most reasonable in

---

a property is likely to bring if sold in the open market. Therefore, the Department determined that deriving a ratio of listed value to sale price on recent arms-length transactions and applying that ratio to similar property types would render a reliable estimation of the total fair market value of the town.

The Department takes the following steps to estimate a town's equalized value: (1) collects sales data; (2) eliminates sales that do not represent market value; (3) stratifies the remaining sales by grand list categories; (4) calculates listed-value-to-sales-price ratios for all market sales; (5) determines equalization ratios that represent reliable estimates of the divergence from 100% of fair market value; (6) applies the resulting ratios to the grand list value for appropriate categories; and (7) sums the resulting values. The total, with adjustments for local agreements and current use appraisal, is the equalized education property value for the town. The Department prepares a preliminary list based on property transfer tax returns, and then works with municipalities to further refine this list.

The 2001 report referenced above was published in December 2001, and it included a study of sales between April 1, 1998 and March 31, 2001. We refer to this study as the "2001 study" because it was published in December 2001, although, practically speaking, it was not available for reference in any property-tax appeals heard during 2001.

this case. In reaching its conclusion, the court rejected taxpayers' assertion that adjustments to the 2001 CLA, such as for the passage of time, would increase its accuracy. It found taxpayers' arguments in this regard to be speculative and not founded on adequate evidence. Thus, based on a FMV of $1,500,000, and applying an ER of 88.6%, the court concluded that the assessed value of taxpayers' property was $1,329,000 as of April 1, 2002. Taxpayers filed a motion to amend the judgment, which was denied, and this appeal followed.

¶ 9. While this appeal was pending, taxpayers also grieved the 2005 assessment of their property, which was similarly set at $1,329,000. The BCA affirmed the assessment, and taxpayers appealed, this time to the state appraiser. The appeal was heard in October 2006, and in November 2006 the appraiser issued his decision. The parties stipulated that the FMV of the property was $1,775,000, and the appraiser applied an ER of 47.80%, resulting in a listed value of $848,500 as of April 1, 2005.

¶ 10. At trial before the appraiser, taxpayers' expert, Mr. Vickery, argued that a 49.49% ER should apply. He based this ER on a selection of forty-one sales that occurred between October 1, 2004 and April 1, 2005 in the R1, R2, V1, and V2 property categories.[2] These sales were reported in the 2005 PVR equalization study, not available until published in December 2005. Mr. Vickery then adjusted these forty-one sales for time at the rate of 1% per month to account for appreciation of 12% per annum. The Town, in contrast, argued that the proper ER was 70.16% based on all sales from the 2004 PVR equalization study. Alternatively, the Town asserted that taxpayers should have used all of the sales from the 2005 PVR study, rather than using only forty-one sales.

¶ 11. Citing regulations applicable to subsidized housing assessments, the appraiser opined that the most convincing and reliable evidence in determining an ER was a study of all, rather than some, valid sales occurring in a town six months before and six months after the April 1 appraisal date, adjusted for time if appropriate. The next most reliable evidence, the appraiser continued, was obtained from all valid sales in a town occurring one year prior to, or one year after, the April 1 appraisal date. Although Mr. Vickery testified that the six-month approach was

---

[2] These are all classified as "residential" uses. R1 refers to "Residential 1," R2 to "Residential 2," V1 to "Vacation 1," and V2 to "Vacation 2."

best and had data available to him to conduct such an analysis, he chose instead to look at sales occurring in the year prior to April 1, 2005.

¶ 12. The appraiser found that unless there was evidence to the contrary, the CLA for a town as determined by PVR in its annual study provided the broadest measure of equalization, and sales over a three-year period provided the greatest representative statistical sampling. In the instant case, however, the appraiser was persuaded by taxpayers' evidence that in a fast-moving real estate market, sales nearest the appraisal date provided the most accurate ER. It explained that the 2005 PVR study, for example, showed that the ratio for the oldest sales — those occurring between April 1, 2002 and March 31, 2003 — was 72.70%; the ratio for sales occurring between April 1, 2003 and March 31, 2004 was 64.10%; and the ratio for the most recent sales — those occurring between April 1, 2004 and March 31, 2005 — was 50.60%. The appraiser concluded that this evidence demonstrated how a CLA drops sharply with rapid appreciation in real estate values.

¶ 13. The appraiser found that *all* valid sales in *all* categories provided the greatest representative statistical sampling and that all sales were comparable properties for the purpose of equalization. He found that the average ratio of all fifty-nine sales in all property categories in the year prior to April 1, 2005 was 50.60%. He adjusted this ratio for time at the rate of 1.0% per month, resulting in an ER of 47.80%. The appraiser found that this provided the most convincing evidence of the proper ER.[3] In so deciding, the appraiser rejected Mr. Vickery's position that the average ratio of forty-one sales in the R1, R2, V1, and V2 categories, adjusted for time and considering the coefficient of dispersion (COD) for all categories, produced the most accurate

---

[3] In reaching his conclusion, the appraiser used sales data from the 2005 PVR equalization study, finding that it provided the most reliable evidence for determining the proper ER, as the sales were closest in time to the April 1, 2005 appraisal date. The appraiser recognized, however, that in appeals considered before December 2005, there might be no choice but to use the older data in the 2004 study. Mindful of the potential for disparate treatment depending on the timing of appeals, the appraiser noted that when scheduling appeals, care needed to be taken that all appeals in the same municipality were heard either before, or after, a new equalization study was completed and published by PVR.

ER.[4] The appraiser found no convincing evidence that injecting the COD provided a more accurate ER. The appraiser also rejected the Town's assertion that the proper ER should be based on all sales from the 2004 PVR equalization study, or alternatively, on all sales from the 2005 PVR study. The Town appealed from this decision.

¶ 14. Returning to the first appraisal, we begin with taxpayers' challenge to the superior court's determination that the FMV of their property was $1,500,000. Taxpayers first assert that the court could not set the FMV of their property any higher than $1,300,000 (the value found by the BCA) because the Town did not file a cross-appeal. They also contend that their evidence was more persuasive than that presented by the Town, and that the court committed clear error by failing to explain why it did not adopt their position. According to taxpayers, the court also erred by relying on one of the comparable sales identified by Mr. Potter, failing to directly address a mathematical error uncovered in Mr. Potter's assessment at trial, and failing to make a specific finding as to how a transmission line on their property affected the FMV of their property.

¶ 15. All of these arguments are without merit. First, the superior court was not bound by the BCA's findings or limited to the evidence presented below. The proceeding before the court was de novo, which, as we have consistently held, requires the court to "try the dispute anew, as though it had never been heard before." *In re Milot*, 151 Vt. 615, 617, 563 A.2d 1005, 1007 (1989). Thus, it follows that the Town did not need to file a cross-appeal to advocate for a higher FMV than that found by the BCA. We held this explicitly in *Milot*, 151 Vt. at 617, 563 A.2d at 1007, and contrary to taxpayers' assertion, this case has been neither implicitly overruled nor superseded by the rules of appellate procedure. See *id.* (explaining that in de novo appeal under 32

---

[4] The COD, as defined by the PVR, is the average of the absolute deviations of each sales ratio from the median ratio, divided by the median ratio. See Introduction to Vermont's Equalization Study, Vermont Dep't of Taxes, Division of Property Valuation and Review (Dec. 2004), at 6. For purposes of the state equalization study, it is a measure of equity. That is, it shows how fairly distributed the property tax is within a town. A high COD (above 20%) means that many taxpayers are paying more than their fair share and many are paying less than their fair share. If a town's COD is higher than 20%, a town is required to reappraise.

V.S.A. § 4467, trial court is not bound in any way by evidence presented in prior proceedings nor limited by which party takes the appeal). Indeed, any other conclusion would be at odds with the de novo proceeding required under § 4467.

■ ■ ¶ 16. Taxpayers' remaining challenges to FMV are equally without merit. The superior court was presented with competing evidence as to FMV, and it found the Town's evidence more persuasive. See *Harte*, 153 Vt. at 258, 571 A.2d at 54 (explaining that it is elemental that the "resolution of conflicting evidence is left to the discretion of the trial court"). The court reviewed the Town's evidence in detail, noting that it was particularly impressed by Mr. Potter's careful selection of comparable high-end properties and the precision with which he made his adjustments. The court's findings reflect the proper number of adjustments made to each comparable property, and they account for a mathematical error discovered at trial. The court's findings are supported by the record, and they amply demonstrate how the court reached its conclusion. See, e.g., *Kachadorian*, 144 Vt. at 351, 477 A.2d at 967 ("Findings of fact must state clearly what was decided and how the decision was reached." (quotations omitted)). We reject taxpayers' assertion that in determining FMV, the court was required to make a specific finding regarding the effect of a transmission line on their property. See *Monti v. Town of Northfield*, 135 Vt. 97, 101, 369 A.2d 1373, 1377 (1977) ("The court has no specific duty to make findings, requested or otherwise, on each point raised. Findings are sufficient if they dispose of the issues presented."); see also *Kruse*, 145 Vt. at 374, 488 A.2d at 774 (rejecting taxpayers' assertion that state board of appraisers erred by failing to make certain findings regarding structural or functional deficiencies in property, finding that Board satisfied its legal obligation to "sift the evidence and make findings sufficient to indicate to the parties how it reached its ultimate conclusion").

■ ¶ 17. Taxpayers essentially ask this Court to reweigh the evidence and reach a conclusion opposite to that of the superior court. This we will not do. As the trier of fact, it is for the superior court, not this Court, to determine the weight, credibility, and persuasive effect of the evidence. See *Kruse*, 145 Vt. at 374, 488 A.2d at 774 (recognizing that factfinder "is under no obligation to accept, interpret, or apply evidence in accordance with the views of either party"). As the superior court explained, it found

Mr. Vickery inconsistent in his estimation of FMV, and it also found that he relied heavily on his own 2001 assessment of taxpayers' property, which set FMV lower than that established by the BCA in 2001 (a value that taxpayers did not successfully appeal). Mr. Vickery also failed to consider one of the recent comparable sales used by the Town's expert. While taxpayers argue that this sale was an "outlier," the court found otherwise and we will not disturb its assessment on appeal. See *Sondergeld v. Town of Hubbardton*, 150 Vt. 565, 572, 556 A.2d 64, 68 (1988) (rejecting taxpayers' challenge to use of certain sale in determining FMV, and stating that decision to use certain property as a comparable sale "is an evidentiary question which rests solely within the trier's discretion"); see also *Harte*, 153 Vt. at 258, 571 A.2d at 54 ("Unless the properties are so different that comparison is illogical, we will uphold the court's findings."). The superior court did not err in setting the FMV of taxpayers' property at $1,500,000. See *USGen New England, Inc. v. Town of Rockingham*, 2004 VT 90, ¶ 49, 177 Vt. 193, 862 A.2d 269 (Supreme Court review of trial court's valuation decision is "quite deferential"); see also *Barrett v. Town of Warren*, 2005 VT 107, ¶ 5, 179 Vt. 134, 892 A.2d 152 ("We will not disturb a fair market value determination unless an error of law exists.").

■ ■ ¶ 18. We thus turn to the heart of both appeals — the determination of an appropriate equalization ratio. As noted above, the overriding goal of the equalization process is "to ensure that, whatever the fair market value of a property might be, its listed value corresponds with the listed value of comparable properties so that no taxpayer pays more than his or her fair share of the property tax burden." *Allen*, 2004 VT 51, ¶ 9. Generally speaking, "comparable properties" for purposes of calculating an ER include "all properties within the class of property to which the subject property belongs." *Philbin v. Town of St. George*, 156 Vt. 640, 640, 588 A.2d 1060, 1060-61 (1991) (mem.); see also *Bowen v. Town of Burke*, 153 Vt. 131, 133 n.2, 569 A.2d 452, 453 n.2 (1989) (Dooley, J., concurring) (using phrase "class of property" as synonym for "type of property — for example, residential property"). Thus, we have explained that "[w]hen comparable properties exist, their current market value must be compared with their current listed value to arrive at an equalization rate. This rate must then be applied to the subject property's fair market value to produce the

proper listed value." *Kachadorian*, 144 Vt. at 351, 477 A.2d at 967 (citation omitted).

¶ 19. We have also held that where property is unique, or where the factfinder determines that the evidence of comparable properties is insufficient to determine an ER, "all property within the taxing municipality" may be considered "comparable for purposes of determining the proper corresponding listed value." *Id.*; see also *Milot*, 151 Vt. at 616, 563 A.2d at 1007 (upholding use of town-wide ER, and explaining that "[a]lthough it is proper for the trial court in tax appeals to apply an equalization ratio derived from comparables, when it is presented with credible evidence supporting their fair market value, the absence of such evidence in the case at hand left the court unable to do so"); *Vt. Elec. Power Co. v. Town of Cavendish*, 158 Vt. 369, 373, 611 A.2d 389, 391 (1992) ("Where the [factfinder] concludes that it lacks a statistically representative sample of comparable property, it may use other evidence to determine the appropriate equalization ratio."); *Philbin*, 156 Vt. at 641, 588 A.2d at 1061 (although factfinder is normally limited to comparing properties in the same class as that of taxpayer's property, "where the Board concludes that it lacks evidence of a statistically representative sample," it may use evidence of other classes).

¶ 20. Indeed, we have stated that because "property taxation rests on notions of equity and fairness, there is no better evidence than the average equalization ratio for all property within the Town" when the factfinder must look elsewhere for evidence of a proper ER. *Vt. Elec. Power Co.*, 158 Vt. at 374, 611 A.2d at 392. At the same time, we have also cautioned that the factfinder should not, "without adequate justification, throw out the proffered comparables and use the tax department's average ratio in every case." *Knollwood Bldg. Condos. v. Town of Rutland*, 166 Vt. 529, 540, 699 A.2d 31, 39 (1997); see also *Alexander v. Town of Barton*, 152 Vt. 148, 154, 565 A.2d 1294, 1297 (1989) (citing *New England Power Co.* and stating that "except in the rare case," § 4467 limits factfinder to looking at comparable properties to determine if differences exist between listed value and FMV, and that use of town-wide ratio is justified by need to give unique property owners some recourse for unfair listing).

¶ 21. Finally, we have recognized that while the approach described above is the "most common equalization method, the law

does not require the use of a single method of equalization," *Allen*, 2004 VT 51, ¶ 9, nor will this Court dictate how equalization should be accomplished. *Philbin*, 156 Vt. at 640, 588 A.2d at 1061 (citation omitted) (stating that this Court will not dictate how equalization should be done). Thus, in *Philbin*, we recognized that "[i]n considering whether or not a particular assessment is lacking in uniformity, . . . a property owner, the taxing authority and the courts may rely on any relevant evidence" and "the description of the class, the determination of which properties fit that class, or the use of other evidence where the [factfinder] concludes that it lacks evidence of a statistically representative sample under § 4467 are all matters that are within the sound discretion of the [factfinder]." 156 Vt. at 641, 588 A.2d at 1061 (citation omitted).

¶ 22. With these principles in mind, we consider taxpayers' assertion that the superior court erred in the first appeal by looking to sales of *all* property in the town to calculate an ER, rather than adopting one of the ERs developed by Mr. Vickery, which relied upon the sales of selected "comparable" properties. According to taxpayers, the use of a town-wide ratio was inappropriate because (1) there was no finding of unique circumstances sufficient to overcome the presumption of equalization to properties within the same class as taxpayers' property; and (2) the town-wide ratio included dissimilar properties in categories that were not appreciating at a rate similar to taxpayers' property.[5]

¶ 23. These arguments are not convincing. The superior court was unpersuaded by taxpayers' evidence, finding their expert inconsistent in his calculation and application of proper ERs. Given its conclusion, amply supported by the record, the court acted well within its discretion in looking to all property sales within the town to ensure that taxpayers were not paying a disproportionate share of the town's tax burden.

¶ 24. The record shows that at trial taxpayers presented evidence in support of several different ERs, each derived from the sales of selected residential properties culled from the 2003 PVR study (reflecting sales between April 1, 2000 to April 1, 2003). In calculating his ERs, taxpayers' expert excluded condominium

---

[5] We note that taxpayers do not challenge the state appraiser's use of an ER in the second appeal derived from sales in all property categories within the town, nor do they complain in that case about the inclusion of sales of property appreciating at different rates from the residential property within the town.

sales, mobile home sales, and commercial sales because he believed that these properties were not experiencing the same 12% annual inflation as other residential properties in the town.

¶ 25. Mr. Vickery's first proposed ER was 59.85% based on a comparison of the FMV and listed value of fifteen R2 and V2 properties over a three-year period, adjusted for time from the midpoint of the state study (October 1, 2001). To adjust for the passage of time, Mr. Vickery increased the sales price of each category by 6%, then divided that value into the assessed value. His first ER was thereby reduced from 63.45% to 59.85%. Mr. Vickery also calculated an ER of 66.35% by expanding the sample size to include sales from the R1 and V1 categories over the same three-year period, with the exception of those types of sales noted above, for a total of sixty-four sales. This ratio similarly reflected a time adjustment of 6%. Mr. Vickery testified that if he had to choose between the two ERs that he developed, he would opt for the 66.35% ratio because it was derived from a larger sample of sales.

¶ 26. Mr. Vickery acknowledged that he took a different approach to calculating an ER in the underlying grievance to the town listers and before the BCA. In the proceeding before the listers, Mr. Vickery *did* include condominiums, mobile homes, commercial properties, and property that fell within the miscellaneous category (including open land sales) in his calculation. He did not adjust this ratio for time. Shortly thereafter, appearing before the BCA, Mr. Vickery took a different approach, offering a higher estimate of FMV and a lower ER, with the end result being approximately the same listed value that he had advocated before the listers. In arriving at his proposed ER of 65.17% before the BCA, Mr. Vickery looked to sales in categories "most similar" to taxpayers' property — R1, R2, V1, and V2 — that occurred between April 1, 2001 and April 1, 2002. He did not adjust these sales for time. As in the proceedings before the superior court, Mr. Vickery excluded certain categories of sales within the residential classifications; he also excluded several residential sales that he considered to be extreme or outliers because their FMV equaled or exceeded their listed value, despite the fact that these sales were not excluded from the state study on this basis. Mr. Vickery acknowledged that all of the sales that he excluded were equal to or higher than the ratios of the sales

that he had included in his study, and that had they been included, the result would have been a higher ER.[6]

¶ 27. Notwithstanding these varied approaches taken by their expert, taxpayers argue that the superior court was none-theless obligated to accept one of their proposed ERs simply because they considered the sales of comparable properties in arriving at their ratios. This position is without merit. Surely in light of the evidence described above, the court was justified in concluding that Mr. Vickery was not consistent in his calculation and application of proper ERs. Indeed, we note that Mr. Vickery's approach, and his exclusion of certain sales, is also inconsistent with our cases holding that *all* property within the same class is considered "comparable" for purposes of § 4467, not just property that is appreciating at the same rate. See *Philbin*, 156 Vt. at 640, 588 A.2d at 1061 (explaining that if class of comparable properties considered for equalization purposes is unduly narrowed, it leaves " 'little likelihood that the average of the ratios of the properties is equal or close to the average of all ratios or the average of the ratios for properties within the class' " (quoting *Bowen*, 153 Vt. at 136, 569 A.2d at 454 (Dooley, J., concurring))); see also *Couse v Town of Leicester*, 156 Vt. 570, 571-72, 593 A.2d 473, 474 (1991) (emphasizing that the comparison of comparables should be achieved by using the "largest and fairest possible sampling of comparable properties," and remanding where Board failed to include eleven relevant comparables in calculating its ER). The superior court did not err in rejecting taxpayers' evidence and looking instead to the town-wide ratio.

¶ 28. This leads us to the question of whether the application of an ER derived from three years of sales, as opposed to one derived from one year of sales, provides the most

---

[6] More specifically, Mr. Vickery testified that, in his calculation for the BCA hearing, he removed twenty-five sales from his original calculation, all of which had individual ERs greater than 70%, which was higher than the ER that he was advocating to the BCA. Thus, Mr. Vickery removed the sales of condominiums, which as a class had an ER of 89.56%, and would have resulted in a higher ER had they been included. Yet he retained open land sales in his calculation, although he stated that this type of property was also appreciating at a different rate than residential property. This category of sales had a lower average ER than sales in the residential category, which had the effect of reducing the overall ER. As noted above, Mr. Vickery also excluded several residential sales with individual ERs that equaled or exceeded 100%.

accurate equalization ratio. As noted above, the superior court used the 2001 CLA to equalize the April 1, 2002 FMV of taxpayers' property. In contrast, the state appraiser found that because there was evidence of rapid appreciation within the town, a one-year average closest in time to the appraisal date provided the most accurate ratio. We agree with the state appraiser's approach, and thus conclude that where evidence is presented showing a steep rate of appreciation, the most accurate ER is determined by looking at sales closest in time to the appraisal date — whether one year prior to the appraisal date or six months before and after the appraisal date — unless the trier of fact is persuaded by the evidence that such an approach is unfair, flawed, or otherwise inappropriate.

¶ 29. The appraiser applied an ER of 47.8% based on fifty-nine sales in all property categories in the year prior to April 1, 2005, adjusted for time at the rate of 1.0% per month. The Town argues that the appraiser erred in applying such an approach, maintaining that the appraiser should have applied the unadulterated 2004 CLA of 70.16%. It offers a variety of arguments as to why this value was more appropriate, focusing on the consistency and reliability of this value as well as the legal reality of a statewide educational property tax scheme and the broad-based equity achieved by using this approach. According to the Town, the state appraiser's rejection of its approach was not sufficiently explained. Turning to the ER actually employed by the appraiser, the Town questions the appraiser's reliance on regulations related to valuation of subsidized housing. It argues that the appraiser's ER was erroneously derived and that his methodology was neither predictable nor consistent with his obligation to ensure an equitable assessed value. The Town also asserts that the appraiser failed to explain why a time adjustment rendered its ER more reliable.

¶ 30. With one exception, we reject these arguments. The state appraiser has wide discretion in calculating an appropriate ER, and he was not required to adopt the Town's approach. Nor was the appraiser obligated to explain in detail why he was not persuaded by the Town's position. *Monti*, 135 Vt. at 101, 369 A.2d at 1377; see also *Knollwood*, 166 Vt. at 547, 699 A.2d at 43 (rejecting taxpayers' argument that factfinder's reasons for rejecting the ER proposed by its expert were erroneous, concluding that "the matter lies within the [factfinder]'s discretion in evaluating the evidence before it").

¶ 31. Whatever the relevance of the subsidized housing regulations to property-tax appeals generally, we find no error in the state appraiser's conclusion that the most relevant data in this case were derived from a study of sales within one year of the appraisal date. As reflected in his decision, the appraiser was persuaded by taxpayers' expert that home values were rapidly rising in the town, and thus, that recent data provided a more reliable and accurate ER. It is for the appraiser, as the trier of fact, to weigh the evidence, and we find the reasons underlying the appraiser's decision to use sales occurring one year before the appraisal date sufficiently explained.

¶ 32. We agree with the Town, however, that the appraiser failed to explain why a time-adjustment of 1% per month rendered this value even more precise. It is not apparent from the record why a time-adjustment of all sales in *all* property classes — despite presumably very different rates of appreciation across classes — resulted in a more accurate ER. Indeed, Mr. Vickery relied on the different appreciation rates of property within the town — albeit inconsistently — as the rationale for excluding certain classes of property from his calculation of an ER in the superior court proceedings. See *supra*, ¶¶ 22-24. In the proceedings before the state appraiser, Mr. Vickery also excluded certain classes of property from his calculation of an ER, and thus, the time adjustment he employed in his study applied only to the residential properties he selected, not to all property sales within a one-year period. Because we cannot discern from the record precisely how the appraiser implemented the time adjustment or why its application to all classes of property renders the ER more accurate, we remand for additional findings.

¶ 33. We agree with the Town that the use of the town-wide CLA has many of the advantages that it describes. It is not subject to manipulation, and it offers consistency, reliability and broad-based equity town-wide. And in fact, the appraiser applied a ratio derived from the town-wide CLA in this case. We cannot conclude, however, that, as a matter of law, the appraiser's use of data from the state study, reflecting fifty-nine sales taken from the year closest in time to the appraisal date, must be considered less reliable than a three-year average ratio that includes sales dating back to 2002, particularly given the evidence of rapid appreciation within the town. Although a three-year average ratio is used for purposes of ascertaining the statewide education tax, it

does not necessarily follow that such an average best ensures that the listed value of taxpayers' property corresponds to the listed value of comparable properties within the town as required by 32 V.S.A. § 4467.

¶ 34. We recognize the potential inconsistency that may occur depending on the timing of property-tax appeals within a town and the availability of yearly statewide data. But we conclude that this is a question of general concern for the Legislature to resolve. On the facts of this case, we find no abuse of discretion.

¶ 35. As noted above, in the first appeal, the superior court applied an ER derived from a three-year study of sales. Because there was evidence presented to the superior court that residential property in the town was experiencing a similarly rapid rate of appreciation prior to April 1, 2002, it appears that the most accurate ER would be derived from all sales, adjusted for time if appropriate, occurring in the year prior to — or the six-month period before and after — the April 1, 2002 appraisal date. We therefore reverse and remand for the application of such an ER, subject to any arguments that might be raised as to why such an ER is inappropriate on the facts of this case.

*The superior court's decision as to the 2002 listed value of taxpayers' property is reversed and remanded; the appraiser's decision as to the 2005 listed value of taxpayers' property is remanded for additional findings on whether a time adjustment is appropriate.*