2015 VT 10

## In re Bilmar Team Cleaners
## (Margaret Murray, Appellant)

[114 A.3d 483]

No. 13-414

Present: **Reiber,** C.J., **Dooley, Skoglund** and **Robinson,** JJ., and **Zonay,** Supr. J., Specially Assigned

Opinion Filed January 16, 2015

*Margaret Murray*, Pro Se, Montpelier, Plaintiff-Appellant.

*Eugene M. Bergman* and *Eileen M. Blackwood*, Burlington, for Defendant-Appellee City of Burlington.

¶ 1. **Reiber, C.J.** Taxpayer appeals the superior court, civil division's decision to uphold the Burlington Board of Tax Appeals' appraisal of 150 Shelburne Road in Burlington at a value of $193,500. Taxpayer contends that (1) she presented sufficient evidence that the property was not assessed at fair market value

to overcome the city appraisal's presumption of validity, and (2) the City of Burlington failed to meet its burden of proof demonstrating the property was assessed at fair market value. We affirm the superior court for the following reasons.

¶ 2. The property at issue was a gas filling station from the 1940s until the 1970s, when a fire caused the station's removal. Taxpayer and her business partner purchased the lot in 1987 to use for their business, Bilmar Team Cleaners. In 1993, petroleum was discovered to be contaminating the property's groundwater, likely due to leaky underground storage tanks from when the property was a gas station. Since the discovery, taxpayer has spent over $20,000 on engineering studies and installed several wells to monitor the contamination. The Department of Environmental Conservation (DEC), tasked with measuring and tracking petroleum pollution for the state, has requested an additional $10,000 of monitoring on taxpayer's property before it will issue a "Site Management Activities Completed" designation for the property and remediation efforts will come to a close. The property remains listed as an unremediated petroleum pollution site due to taxpayer's inability or unwillingness to pay for this additional monitoring or obtain funding from the Vermont Petroleum Cleanup Fund (PCF). Taxpayer believes the petroleum contamination renders her property valueless, and has not paid city real estate tax on the property for many years.

¶ 3. The PCF provides up to $990,000 in remediation costs once a property owner has paid the initial $10,000. Generally, petroleum pollution is measured and tracked until DEC is convinced that all reasonable efforts were made to address the problem. The PCF would likely cover taxpayer's cost of remediation because the property's pollution levels have decreased over the years. It is possible that taxpayer's expenditures to date would satisfy the $10,000 initial cost. Taxpayer does not believe participating in the PCF is in her best interest. She also believes the PCF benefits only those with political connections. Taxpayer also fears that signing up for the PCF will leave her liable for additional expenses if the cost of remediation exceeds the $990,000 cap, or if the fund runs out of money.

¶ 4. On November 17, 2011, the Board of Tax Appeals appraised the property at $193,500. The Board started with a fair market value of $225,000 based on the value of nonpolluted properties, discounted $10,000 because of the property's petroleum pollution,

and then applied an equalization rate to arrive at this value. The Board noted that the availability of the PCF is the best predictor for the property's future. Taxpayer appealed the Board's valuation to the superior court.

¶ 5. In court, the City supported the Board's cost-to-cure appraisal with evidence that other methods of valuation resulted in similar values. Taxpayer currently rents out the property as a single-family dwelling for $20,400 annually. Taxpayer's appraiser testified that under the gross rent multiplier method, which calculates value based on the ratio of sales price to rental income, the property was worth between $204,000 and $255,000. Additionally, the City introduced testimony from a willing investor, who had previously offered $185,000 to purchase the property. The City also introduced evidence that taxpayer had previously listed the property for sale at prices of $349,000 and $389,000.

¶ 6. Taxpayer argued the $10,000 cost-to-cure reduction did not adequately account for the impact the stigma of pollution had on the property value. Taxpayer's appraiser testified that the Board's initial assessment of fair market value was accurate, but asserted that the stigma of petroleum pollution reduced the property's value beyond the $10,000 cost-to-cure. He was unable to conduct a study to support his statement because of its cost. Taxpayer testified that she believed the petroleum pollution made the property valueless. Taxpayer argued it was unreasonable to assume the PCF would cover future remediation costs because the fund itself could run out of money or the cost could exceed the $990,000 cap, citing a PCF settlement in which remediation exceeded $2,000,000. Additionally, she pointed to the fact that no one bid on her property at a tax sale as proof that the City's valuation was inaccurate. Finally, taxpayer argued that the offer from the willing investor to buy the property was not a legitimate offer because it relied on the PCF to cover the costs of remediating the petroleum pollution. When questioned by taxpayer, the willing investor stated that he would pay only $10,000 to $20,000 if forced to purchase the property sight unseen and without using any programs to limit liability, but also stated that such conditions were "absurd."

¶ 7. The superior court ruled in favor of the City, holding that the cost-to-cure methodology was appropriately used by the Board and that taxpayer failed to overcome the initial presumption of validity in favor of the Board's decision. The court found that the

$10,000 cost to cure was accurate because the PCF would likely cover all additional expenses. The court also found taxpayer's appraiser's testimony on the stigma of petroleum pollution unconvincing because it was not supported by studies or data. The court did not find taxpayer's claim that the property was valueless credible due to the consistent rental income the property generated, the prices at which taxpayer listed the property to sell, and the investor's previous offer to buy. The court concluded that even if the taxpayer overcame the initial presumption in favor of the Board's appraisal, the City's evidence was more persuasive. This appeal follows.

¶ 8. On review of a tax appraisal determination from a board of civil authority, the superior court proceeds de novo to determine the property's value. 32 V.S.A. § 4467; see also *Boivin v. Town of Addison*, 2010 VT 67, ¶ 6, 188 Vt. 571, 5 A.3d 897 (mem.). On appeal to this Court, the superior court's conclusions will be affirmed "where they are reasonably drawn from the evidence presented." *Dewey v. Town of Waitsfield*, 2008 VT 41, ¶ 3, 184 Vt. 92, 956 A.2d 508. We defer to the superior court's determinations with regard to evidentiary credibility, weight, and persuasiveness. *Id.* ¶ 17.

¶ 9. Taxpayer argues the superior court erred in upholding the Board's valuation, claiming that (1) taxpayer presented sufficient evidence that the property was not assessed at fair market value to overcome the initial presumption of validity given to the City's assessment, and (2) the City produced insufficient evidence to justify its appraisal of the property's value. In affirming the superior court's ruling, we find that its determinations regarding the weight of the evidence were reasonable and that its findings were supported by the record. See *Kachadorian v. Town of Woodstock*, 149 Vt. 446, 448, 545 A.2d 509, 510 (1988) ("Our function on appeal from a determination of a state board of appraisers is to scrutinize the board's actions in conducting its de novo review of a property appraisal. The conclusions of the trier of fact, if supported by the findings, will be upheld." (citations omitted)).

¶ 10. ■ On an appeal from the Board, the City has an initial burden to produce evidence that the property was appraised at fair market value. *Barrett v. Town of Warren*, 2005 VT 107, ¶ 7, 179 Vt. 134, 892 A.2d 152. Once fair market value is shown, there

is a presumption in favor of the appraisal. *City of Barre v. Town of Orange*, 152 Vt. 442, 444, 566 A.2d 951, 952 (1989). A taxpayer may "burst the bubble" and defeat this presumption by presenting "credible evidence fairly and reasonably tending to show that his property was appraised at more than its fair market value." *Adams v. Town of West Haven*, 147 Vt. 618, 619-20, 523 A.2d 1244, 1245 (1987) (quotation omitted); see also *Rutland Country Club, Inc. v. City of Rutland*, 140 Vt. 142, 145, 436 A.2d 730, 732 (1981) ("[T]he presumption of validity of a city's evaluation is . overcome when credible evidence is introduced fairly and reasonably indicating that the property was assessed at more than the fair market value." (quotation omitted)). The evidence presented will overcome the presumption if "the fact[s] offered in proof afford a basis for a rational inference of the fact to be proved." *Kruse v. Town of Westford*, 145 Vt. 368, 372, 488 A.2d 770, 772 (1985) (quotation omitted). If the presumption of validity is overcome, the City can justify the appraisal by showing either that it "substantially complied with the relevant statutory and constitutional requirements," or that its appraisal is supported by "independent evidence relative to the property's fair market value and the listed value of comparable properties." *Littlefield v. Town of Brighton*, 151 Vt. 600, 602, 563 A.2d 998, 1000 (1989).

¶ 11. ▊ The burden to overcome the presumption of the City's initial valuation "[cannot be] met by simply impugning the Board's methods or questioning its understanding of assessment theory or technique." *Sondergeld v. Town of Hubbardton*, 150 Vt. 565, 568, 556 A.2d 64, 66 (1988). "The standard for the facts sought to be used to overcome the burden . . . is not actually one of credibility, requiring a subjective evaluation of the evidence, but rather of admissibility . . . ." *Rutland Country Club, Inc.*, 140 Vt. at 146, 436 A.2d at 732. The evidence required to burst the bubble is therefore modest. After the bubble is burst, however, "the burden of persuasion remains on the taxpayer as to all contested issues." *Id.*; see also *Kruse*, 145 Vt. at 372, 488 A.2d at 773 ("The burden of persuading the trier of fact that his property is over-assessed . . . remains with the taxpayer throughout the entire proceeding."). Thus, regardless of whether the evidence introduced by taxpayer was sufficient to burst the bubble, that evidence still had to carry the day over the City's countervailing evidence.

¶ 12. Here, the superior court concluded that taxpayer failed to burst the bubble. It also weighed the evidence and contemplated

the outcome of the case had taxpayer successfully burst the bubble. The superior court concluded that the City would prevail on the merits of the dispute even if taxpayer had burst the bubble for the City's evidence far outweighed taxpayer's. Under a standard of review that requires us to accept the superior court's conclusion if it is reasonably drawn from the evidence, *Dewey*, 2008 VT 41, ¶ 3, we agree that the weight of the evidence lies in the City's favor. Thus — even if we assume without deciding that the taxpayer's evidence was sufficient to burst the bubble — we decline to conclude that the superior court abused its discretion in upholding the Board's determination of the property's value.

¶ 13. ■ Although bona fide property sales provide the "most persuasive method" for appraising residential property at fair market value, that method is not required. *Sondergeld*, 150 Vt. at 567, 556 A.2d at 66. When there are too few comparable transactions to provide a reference for determining fair market value, we have upheld the " 'use of any or all methods' " or combination of methods that result in a rational determination. *Boivin*, 2010 VT 67, ¶ 6 (quoting *Lake Morey Inn Golf Resort, Ltd. P'ship v. Town of Fairlee*, 167 Vt. 245, 248-49, 704 A.2d 785, 787 (1997)). The Board determines the best method on a "case-by-case basis, and as long as the method is supported by the findings, we will not disturb the Board's decision." *Lake Morey Inn Golf Resort*, 167 Vt. at 249, 704 A.2d at 787 (upholding the Board's use of "costs" method of valuation over taxpayer's "market comparable" method); see also *State Hous. Auth. v. Town of Northfield*, 2007 VT 63, ¶ 5, 182 Vt. 90, 933 A.2d 700 (stating that "any valuation method resulting in a rational determination of fair market value will survive scrutiny").

¶ 14. ■ The superior court reasonably concluded that the cost-to-cure method accurately calculated the property's fair market value. The superior court accepted the valuation based on the cost-to-cure method because neither the City nor taxpayer's appraisers could find sufficient comparable properties in the area with similar pollution levels. The superior court noted that appraisers for both parties had used the cost-to-cure method in previous appraisals of polluted properties. Furthermore, both appraisers agreed that the property, if pollutant free, would have a fair market value of $225,000. While their opinions differed over the actual cost of remediating the pollution in this case, they did not dispute the cost-to-cure methodology itself.

¶ 15. ▮ Taxpayer claims that the superior court was wrong to credit the cost-to-cure valuation because the property's valuation was not based on comparable properties. A lack of comparable properties, however, does not mean that the appraiser cannot reasonably determine the fair market value using other methods. See *Sondergeld*, 150 Vt. at 567, 556 A.2d at 66 ("While the most persuasive method of appraising residential property in Vermont is to establish fair market value through bona fide sale transactions, our statute does not prescribe the method nor limit the manner in which evidence of fair market value may be presented . . . ." (citation omitted)). It was within the superior court's discretion to determine the credibility of the valuation method used, and it was not an error for the superior court to accept the City's cost-to-cure method given the lack of comparable properties in this case. See *New Eng. Power Co. v. Town of Barnet*, 134 Vt. 498, 505, 367 A.2d 1363, 1368 (1976) (explaining that "the elements and appraisal approaches which may be utilized in arriving at fair market valuation . . . are appropriate subjects for expert testimony to be properly evaluated by the trial court"); *Scott Constr., Inc. v. City of Newport Bd. of Civil Auth.*, 165 Vt. 232, 237, 683 A.2d 382, 385 (1996) (stating that court is not limited to comparable properties and can consider "any competent, relevant, and probative evidence of valuation"). Based on these factors, the superior court reasonably concluded that the cost-to-cure method was a "rational, logical, and fair way to arrive at a fair market value." *Boivin*, 2010 VT 67, ¶ 9.

¶ 16. ▮ ▮ The court's determination that $10,000 was the actual cost to cure is also supported by the record. The City's appraiser, while expressing uncertainty as to the exact total cost of remediation, testified that he believed the PCF would cover all additional remediation costs beyond taxpayer's initial $10,000. In any event, the evidence showed that the costs were unlikely to exceed the PCF's limit of $990,000. Since the pollution was discovered, DEC had only required ongoing monitoring, totaling approximately $20,000 with another $10,000 requested for additional wells and testing. The court found no evidence that the property was highly polluted or located in a sensitive location. Based on the property's location on a well-traveled state highway, Route 7, and its proximity to several active filling stations, the court found it unlikely that any remediation would be ordered beyond monitoring, or that any contamination detected on the

opposite side of the road would be traced to her property. Pollution levels on the property have decreased over the years, further reducing the likelihood that DEC would require additional, costly treatment. Finally, the court found no evidence of a further reduction in value due to stigma, noting that neither side had been able to locate sufficient data to show that underground petroleum contamination could depress the value of single-family homes beyond the cost to cure. The weight given this evidence and the "trial court's evidentiary credibility determinations will be upheld absent an abuse of discretion." *Boivin*, 2010 VT 67, ¶ 9. Because the cost-to-cure method was supported by findings, the court correctly applied the presumption in favor of the Board's appraisal. *Lake Morey Inn Golf Resort*, 167 Vt. at 249, 704 A.2d at 787.

¶ 17. In addition to the cost to cure, the superior court identified several other factors supporting the Board's appraisal. Taxpayer's appraiser valued the property between $204,000 and $255,000 using the gross-rent-multiplier method, based on the $20,400 taxpayer earns annually renting the property. Additionally, an investor offered $185,000 to purchase the property, close to the Board's valuation at $193,500. Although the investor's offer depended on the assumption that the PCF would cover clean-up costs, and included paying back taxes to the City, it offered independent support for the Board's valuation, and suggested that taxpayer's equity in the property after the tax lien may be as much as $110,000. The gross rent multiplier and the offer to buy are both in a similar price range as the cost-of-cure valuation, supporting the Board's valuation. See *Barnett v. Town of Wolcott*, 2009 VT 32, ¶ 10, 185 Vt. 627, 970 A.2d 1281 (mem.) (upholding appraiser's use of unaccepted offers to buy and sell to support fair market value).

¶ 18. ▮▮▮▮ Taxpayer argues that the $10,000 "cost to cure" is arbitrary because the total cost of remediation is unknown. This argument is unconvincing because "regulatory uncertainty does not bar the appraiser from considering development potential in determining fair market value." *Zurn v. City of St. Albans*, 2009 VT 85, ¶ 9, 186 Vt. 575, 980 A.2d 795 (mem.) (holding that taxpayers' claim that their property had no value due to uncertainty in obtaining Act 250 permits necessary to subdivide the property was "wholly without merit" and "totally unreasonable" as a matter of law); see also *Scott Constr., Inc.*, 165 Vt. at 236, 683

A.2d at 384 (rejecting taxpayers' claim that "the mere existence of uncertainty in the regulatory process bars consideration of development potential"). Moreover, the cost of remediation is unknown due precisely to taxpayer's failure to use the PCF fund. Property appraisals in Vermont are based on the highest and best use of the property, and to reward taxpayer in this case for her refusal to pursue the clean-up of her property would run contrary to the statutory purpose. *Scott Constr., Inc.*, 165 Vt. at 235, 683 A.2d at 383 (citing 32 V.S.A. § 3481) (stating that fair market value should be based on highest and best use of property, not on how taxpayer chooses to use land). While taxpayer's appraiser testified that the stigma of petroleum pollution reduced the value beyond $10,000, he offered no studies or data to support this opinion. See *Sondergeld*, 150 Vt. at 568, 556 A.2d at 66 ("The taxpayer's speculation . . . is no substitute for evidence in a specific case.").

¶ 19. Taxpayer's evidence regarding a property in New Haven that exceeded $2,000,000 in remediation costs is similarly speculative and not on point. Unlike the property at issue, the New Haven property suffered extensive contamination, leading the DEC to order removal and to require the installation of treatment systems. Taxpayer has offered no evidence to show that the level of pollution of the two properties is remotely comparable.

¶ 20. ■■ ■ Finally, we reject taxpayer's opinion that the property is valueless. While the superior court may consider the "opinions of well informed persons," including the property owner, "[t]he weight to be given such testimony is, of course, for the court" to decide. *New Eng. Power Co.*, 134 Vt. at 504, 367 A.2d at 1367; see 12 V.S.A. § 1604 ("The owner of real or personal property shall be a competent witness to testify as to the value thereof."); 32 V.S.A. § 4467 (providing for de novo appraisal appeals before hearing officer or superior court to "determine the correct valuation of the property" and that hearing officer or superior court "shall take into account the requirements of law as to valuation"). Taxpayer argues that the lack of bidders for her property at the tax sale demonstrated that the property was worth nothing, but the superior court credited the City appraiser's testimony rebutting taxpayer's opinion, which noted that tax sales are not good indicators of property value because of low attendance and restrictions on the property sold, such as the owner's right to redeem. The superior court also noted that the steady rental income generated by the property and taxpayer's attempts

to sell the property for $349,000 to $389,000 diminished the credibility of taxpayer's claim that the property was valueless. Taxpayer cites *Barnett v. Town of Wolcott* to support the proposition that unaccepted offers "reflect a mere hope rather than 'the price which the property will bring in the market'" and are "so lacking in probative value" that the court erred by considering them. 2009 VT 32, ¶ 10 (quotations omitted). However, while unaccepted offers to sell and buy should not be a determinant factor in setting fair market value, here the court used this evidence appropriately not to set the fair market value, but to contradict taxpayer's own testimony that she believed the property was worthless.

*Affirmed.*