2008 VT 41



Dewey
v. Town of Waitsfield (2006-068 & 2006-527)

 

2008
VT 41

 

[Filed
11-Apr-2008]

 

NOTICE: 
This opinion is subject to motions for reargument under V.R.A.P. 40 as well as
formal revision before publication in the Vermont Reports.  Readers are
requested to notify the Reporter of Decisions, Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801 of any errors in order that corrections may
be made before this opinion goes to press.

 

                                                                            2008
VT 41

 

                                                               Nos.
2006-068 & 2006-527

 

 

John
W. Dewey and Morella L. Dewey                                          Supreme
Court

 

On Appeal from

    
v.                                                                                                 Washington Superior Court

 

Town
of Waitsfield                                                                          and


 

Property Valuation and Review 

Division

 

May Term, 2007

 

Alan
W. Cook, J. (06-068)

Merle
R. Van Gieson, State Appraiser (06-527)

 

Allan
R. Keyes of Ryan, Smith & Carbine, Ltd., Rutland, and Richard W. Darby of
Darby,

 
Stearns, Thorndike, Kolter & Ware, LLP, Waterbury, for
Plaintiffs-Appellants (06-068)

 
Plaintiffs-Appellees (06-527). 

 

Robert
E. Fletcher of Stitzel, Page & Fletcher, P.C., Burlington, for
Defendant-Appellee (06-068)

 
Defendant-Appellant (06-527).

 

PRESENT: 
Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.

 







¶ 
1.          
BURGESS,
J.  In
these consolidated property tax appeals, we consider the listed value of
taxpayers’ property as of April 1, 2002 and April 1, 2005.  In the first
appeal, taxpayers challenge the superior court’s decision to list their
property at $1,329,000 as of April 1, 2002.  In the second appeal, the Town
challenges the state appraiser’s decision to list taxpayers’ property at
$848,500 as of April 1, 2005.  At issue in both appeals is the calculation of
an appropriate equalization ratio.  Taxpayers also challenge the superior court’s
assessment of the fair market value of their property.  As discussed below, we
reverse and remand the superior court’s decision for the recalculation of an
equalization ratio, and we remand the decision of the state appraiser for
additional findings.

¶ 
2.          
Before
turning to the facts, we briefly review general principles applicable to both
cases.  Property tax appeals are considered de novo by either the superior
court or the state appraiser.  32 V.S.A. § 4467.  These tribunals are
charged with determining the correct valuation of property and ensuring that
the listed value of property corresponds to the listed value of comparable
properties within the town.  Id.  This is a two-step process.  First,
the fair market value (FMV) of the property is ascertained.  Next, this value
is “ ‘equalized’ to insure that the property is listed comparably to
corresponding properties in town.”  Kachadorian v. Town of Woodstock,
144 Vt. 348, 350, 477 A.2d 965, 967 (1984) (citations omitted).  Equalization
is necessary because we recognize that a town cannot feasibly list all property
at its FMV every year, particularly in a rising real-estate market.  Allen
v. Town of W. Windsor, 2004 VT 51, ¶ 2, 177 Vt. 1, 852 A.2d 627.  Thus, we
have held that a difference between listed and fair market values of real
property is permissible as “long as the ratio between listed and fair market
values is consistent among properties.”  Id. (explaining that need for
uniformity derives from constitutional command that “no taxpayer pays a
disproportionate share of the public tax burden”).  “The burden of persuading
the trier of fact that his property is over-assessed, which is the underlying
issue, remains with the taxpayer throughout the entire proceeding.”  Kruse
v. Town of Westford, 145 Vt. 368, 372, 488 A.2d 770, 773 (1985); see also New
England Power Co. v. Town of Barnet, 134 Vt. 498, 508, 367 A.2d 1363,1369
(1976) (“It is to be emphasized . . . that the burden of persuasion as to the
contested issues in a § 4467 hearing remains at all times with the taxpayer.”). 








¶ 
3.          
On
review by this Court, the decision by the state appraiser “will be deemed
presumptively correct and its findings will be conclusive if they are supported
by the evidence.”  Lake Morey Inn Golf Resort, Ltd. P’ship v. Town of Fairlee, 167 Vt. 245, 248, 704 A.2d 785, 787  (1997).  In a similar vein, we will not
set aside the trial court’s findings of fact unless they are clearly erroneous,
V.R.C.P. 52(a)(2), and we will affirm its conclusions where they are reasonably
drawn from the evidence presented.  See, e.g., Harte v. Town of Bennington,
153 Vt. 256, 258, 571 A.2d 53, 54 (1989).   

¶ 
4.          
With
this in mind, we turn to the facts.  In 1994, taxpayers purchased seventy acres
of real property in Waitsfield for $660,000.  The property is improved by a
large well-constructed home with an attached three-car garage and small
apartment.  There is a sizeable pond on the property, attractive landscaping,
fenced riding and pasture areas, as well as exceptional views of the entire Lincoln Mountain range.  The property was assessed at $670,700 as of April 1, 1996 after a
town-wide reappraisal. 

¶ 
5.          
In
2000, taxpayers added a 10,536 square foot two-story horse barn to their
property.  The barn has the same architectural appearance and exterior finish
as the dwelling house; it is similarly well-constructed and in excellent
condition.  The barn contains stables, a hay loft, work and storage areas, an
office, a tack room, and a one-bedroom apartment.  The construction of the barn
triggered a reappraisal, and the property was subsequently listed at $1,394,600
as of April 1, 2001.  Taxpayers did not timely appeal from this assessment. 

¶ 
6.          
The
property was listed at the same value in 2002, and taxpayers grieved this
assessment.  The listers reduced the assessed value to $1,151,600, and
taxpayers appealed to the board of civil authority (BCA).  The BCA denied the
appeal and upheld the value set by the listers.  It found the FMV of the
property to be $1,300,000 as of April 1, 2002, and it applied an equalization
ratio (ER) of 88.6%, taken from the State of Vermont’s “common level of
appraisal” (CLA) for all properties in Waitsfield as determined by the Division
of Property Valuation and Review (PVR) of the Vermont Department of Taxes as of
December 2001 (2001 CLA).[1]  







¶ 
7.          
Taxpayers
appealed this decision to the superior court in August 2002.  Trial was
postponed several times at the parties’ request, and the case was ultimately
decided in September 2005.  The court first determined that the FMV of the
property was $1,500,000, relying on testimony offered by the Town’s expert, Spencer
Potter.  Mr. Potter used the “sales comparison” or “market” method and
identified two comparable sales, which he described in detail.  The court
agreed that these two properties were comparables, and that they provided the
best data available as to FMV.  It found the evidence of FMV offered by
taxpayers’ expert, Thomas Vickery, unpersuasive.







¶ 
8.          
Having
established FMV, the court turned next to determining an appropriate ER. 
Taxpayers argued that the court should not use the 2001 CLA of 88.6%, but
rather, it should adopt one of the lower equalization ratios (59.85% or 66.35%)
developed by Mr. Vickery.  The court was not convinced, however, that Mr.
Vickery had been consistent in his calculation and application of proper ERs. 
More importantly, the court continued, it agreed with the Town that the
town-wide ER was more appropriate in this case because it reduced the potential
for disparate treatment among taxpayers, and it offered the broadest possible
equity within the town and the state.  Thus, presented with a choice between
the broad-based 2001 CLA and the ratios calculated by taxpayers, the court
found the use of the CLA most reasonable in this case.  In reaching its
conclusion, the court  rejected taxpayers’ assertion that adjustments to the
2001 CLA, such as for the passage of time, would increase its accuracy.  It
found taxpayers’ arguments in this regard to be speculative and not founded on
adequate evidence.  Thus, based on a FMV of $1,500,000, and applying an ER of
88.6%, the court concluded that the assessed value of taxpayers’ property was
$1,329,000 as of April 1, 2002.  Taxpayers filed a motion to amend the
judgment, which was denied, and this appeal followed.

¶ 
9.          
While
this appeal was pending, taxpayers also grieved the 2005 assessment of their
property, which was similarly set at $1,329,000.  The BCA affirmed the
assessment, and taxpayers appealed, this time to the state appraiser.  The
appeal was heard in October 2006, and in November 2006 the appraiser issued his
decision.  The parties stipulated that the FMV of the property was $1,775,000,
and the appraiser applied an ER of 47.80%, resulting in a listed value of
$848,500 as of April 1, 2005.  

¶ 
10.      
At
trial before the appraiser, taxpayers’ expert, Mr. Vickery, argued that a
49.49% ER should apply.  He  based this ER on a selection of forty-one sales
that occurred between October 1, 2004 and April 1, 2005 in the R1, R2, V1, and
V2 property categories.[2]  These sales
were reported in the 2005 PVR equalization study, not available until published
in December 2005.  Mr. Vickery then adjusted these forty-one sales for time at
the rate of 1% per month to account for appreciation of 12% per annum.  The
Town, in contrast, argued that the proper ER was 70.16% based on all sales from
the 2004 PVR equalization study.  Alternatively, the Town asserted that
taxpayers should have used all of the sales from the 2005 PVR study, rather
than using only forty-one sales.  







¶ 
11.      
Citing
regulations applicable to subsidized housing assessments, the appraiser opined 
that the most convincing and reliable evidence in determining an ER was a study
of all, rather than some, valid sales occurring in a town six months before and
six months after the April 1 appraisal date, adjusted for time if appropriate. 
The next most reliable evidence, the appraiser continued, was obtained from all
valid sales in a town occurring one year prior to, or one year after, the April
1 appraisal date.  Although Mr. Vickery testified that the six-month approach
was best and had data available to him to conduct such an analysis, he chose
instead to look at sales occurring in the year prior to the April 1, 2005.  

¶ 
12.      
The
appraiser found that unless there was evidence to the contrary, the CLA for a
town as determined by PVR in its annual study provided the broadest measure of
equalization, and sales over a three-year period provided the greatest
representative statistical sampling.  In the instant case, however, the appraiser
was persuaded by taxpayers’ evidence that in a fast-moving real estate market,
sales nearest the appraisal date provided the most accurate ER.  It explained
that the 2005 PVR study, for example showed that the ratio for the oldest
sales—those occurring between April 1, 2002 and March 31, 2003—was 72.70%; the
ratio for sales occurring between April 1, 2003 and March 31, 2004 was 64.10%;
and the ratio for the most recent sales—those occurring between April 1, 2004
and March 31, 2005—was 50.60%.  The appraiser concluded that this evidence
demonstrated how a CLA drops sharply with rapid appreciation in real estate
values.  







¶ 
13.      
The
appraiser found that all valid sales in all categories provided
the greatest representative statistical sampling and that all sales were
comparable properties for the purpose of equalization.  He found that the
average ratio of all fifty-nine sales in all property categories in the year
prior to April 1, 2005 was 50.60%.  He adjusted this ratio for time at the rate
of 1.0% per month, resulting in an ER of 47.80%.  The appraiser found that this
provided the most convincing evidence of the proper ER.[3] 
In so deciding, the appraiser rejected Mr. Vickery’s position that the average
ratio of forty-one sales in the R1, R2, V1, and V2 categories, adjusted for
time and considering the coefficient of dispersion (COD) for all categories,
produced the most accurate ER.[4]  The
appraiser found no convincing evidence that injecting the COD provided a more
accurate ER. The appraiser also rejected the Town’s assertion that the proper
ER should be based on all sales from the 2004 PVR equalization study, or
alternatively, on all sales from the 2005 PVR study. The Town appealed from
this decision.

¶ 
14.      
Returning
to the first appraisal, we begin with taxpayers’ challenge to the superior
court’s determination that the FMV of their property was $1,500,000.  Taxpayers
first assert that the court could not set the FMV of their property any higher
than $1,300,000 (the value found by the BCA) because the Town did not file a
cross-appeal.  They also contend that their evidence was more persuasive than
that presented by the Town, and that the court committed clear error by failing
to explain why it did not adopt their position.  According to taxpayers, the
court also erred by relying on one of the comparable sales identified by Mr.
Potter, failing to directly address a mathematical error uncovered in Mr.
Potter’s assessment at trial, and failing to make a specific finding as to how
a transmission line on their property affected the FMV of their property. 







¶ 
15.      
All
of these arguments are without merit.  First, the superior court was not bound
by the BCA’s findings or limited to the evidence presented below.  The
proceeding before the court was de novo, which, as we have consistently held,
requires the court to “try the dispute anew, as though it had never been heard
before.”  In re Milot, 151 Vt. 615, 617, 563 A.2d 1005, 1007 (1989). 
Thus, it follows that the Town did not need to file a cross-appeal to advocate
for a higher FMV than that found by the BCA.  We held this explicitly in Milot,
151 Vt. at 617, 563 A.2d at 1007, and contrary to taxpayers’ assertion, this
case has been neither implicitly overruled nor superseded by the rules of
appellate procedure.  See id. (explaining that in de novo appeal under
32 V.S.A. § 4467, trial court is not bound in any way by evidence
presented in prior proceedings nor limited by which party takes the appeal). 
Indeed, any other conclusion would be at odds with the de novo proceeding
required under § 4467. 

¶ 
16.      
Taxpayers’
remaining challenges to FMV are equally without merit.  The superior court was
presented with competing evidence as to FMV, and it found the Town’s evidence
more persuasive.  See Harte, 153 Vt. at 258, 571 A.2d at 54 (explaining
that it is elemental that the “resolution of conflicting evidence is left to
the discretion of the trial court”).  The court reviewed the Town’s evidence in
detail, noting that it was particularly impressed by Mr. Potter’s careful
selection of comparable high-end properties and the precision with which he
made his adjustments. The court’s findings reflect the proper number of
adjustments made to each comparable property,  and they account for a
mathematical error discovered at trial.  The court’s findings are supported by
the record, and they amply demonstrate how the court reached its conclusion. 
See, e.g., Kachadorian, 144 Vt. at 351, 477 A.2d at 967 (“Findings of
fact must state clearly what was decided and how the decision was reached.”
(quotations omitted)).  We reject taxpayers’ assertion that in determining FMV,
the court was required to make a specific finding regarding the effect of a
transmission line on their property.  See Monti v. Town of Northfield,
135 Vt. 97, 101, 369 A.2d 1373, 1377 (1977) (“The court has no specific duty to
make findings, requested or otherwise, on each point raised.  Findings are
sufficient if they dispose of the issues presented.”); see also Kruse,
145 Vt. at 374, 488 A.2d at 774 (rejecting taxpayers’ assertion that state
board of appraisers erred by failing to make certain findings regarding
structural or functional deficiencies in property, finding that Board satisfied
its legal obligation to “sift the evidence and make findings sufficient to
indicate to the parties how it reached its ultimate conclusion”).  







¶ 
17.      
Taxpayers
essentially ask this Court to reweigh the evidence and reach a conclusion
opposite to that of the superior court.  This we will not do.  As the trier of
fact, it is for the superior court, not this Court, to determine the weight,
credibility, and persuasive effect of the evidence.  See Monti, 135 Vt. at 101, 369 A.2d at 1377 (recognizing that factfinder “is under no obligation to
accept, interpret, or apply evidence in accordance with the views of either
party”).  As the superior court explained, it found Mr. Vickery inconsistent in
his estimation of FMV, and it also found that he relied heavily on his own 2001
assessment of taxpayers’ property, which set FMV lower than that established by
the BCA in 2001 (a value that taxpayers did not successfully appeal).  Mr.
Vickery also failed to consider one of the recent comparable sales used by the
Town’s expert.  While taxpayers argue that this sale was an “outlier,” the
court found otherwise and we will not disturb its assessment on appeal.  See Sondergeld
v. Town of Hubbardton, 150 Vt. 565, 572, 556 A.2d 64, 68 (1988) (rejecting
taxpayers’ challenge to use of certain sale in determining FMV, and stating
that decision to use certain property as a comparable sale “is an evidentiary
question which rests solely within the trier’s discretion”); see also Harte,
153 Vt. at 258, 571 A.2d at 54 (“Unless the properties are so different that
comparison is illogical, we will uphold the court’s findings.”).  The superior
court did not err in setting the FMV of taxpayers’ property at $1,500,000.  See
USGen New England, Inc. v. Town of Rockingham, 2004 VT 90, ¶ 49, 177 Vt.
193, 862 A.2d 269 (Supreme Court review of trial court’s valuation decision is “quite
deferential”); see also Barrett v. Town of Warren, 2005 VT 107, ¶ 5, 179
Vt. 134, 892 A.2d 152 (“We will not disturb a fair market value determination
unless an error of law exists.”). 







¶ 
18.      
We
thus turn to the heart of both appeals—the determination of an appropriate
equalization ratio.  As noted above, the overriding goal of the equalization
process is “to ensure that, whatever the fair market value of a property might
be, its listed value corresponds with the listed value of comparable properties
so that no taxpayer pays more than his or her fair share of the property tax
burden.”  Allen, 2004 VT 51, ¶ 9.  Generally speaking, “comparable properties”
for purposes of calculating an ER include “all properties within the class of
property to which the subject property belongs.”  Philbin v. Town of St.
George, 156 Vt. 640, 640, 588 A.2d 1060, 1060-61 (1991) (mem.); see also Bowen
v. Town of Burke, 153 Vt. 131, 133 n.2, 569 A.2d 452, 453 n.2 (1989)
(Dooley, J., concurring) (using phrase “class of property” as synonym for “type
of property—for example, residential property”).  Thus, we have explained that “[w]hen
comparable properties exist, their current market value must be compared with
their current listed value to arrive at an equalization rate.  This rate must
then be applied to the subject property’s fair market value to produce the
proper listed value.”  Kachadorian, 144 Vt. at 351, 477 A.2d at 967
(citation omitted). 

¶ 
19.      
We
have also held that where property is unique, or where the factfinder
determines that the evidence of comparable properties is insufficient to
determine an ER, “all property within the taxing municipality” may be
considered “comparable for purposes of determining the proper corresponding
listed value.”  Id.; see also Milot, 151 Vt. at 616, 563 A.2d at
1007 (upholding use of town-wide ER, and explaining that “[a]lthough it is
proper for the trial court in tax appeals to apply an equalization ratio
derived from comparables, when it is presented with credible evidence
supporting their fair market value, the absence of such evidence in the case at
hand left the court unable to do so”); Vt. Elec. Power Co. v. Town of
Cavendish, 158 Vt. 369, 373, 611 A.2d 389, 391 (1992) (“Where the
[factfinder] concludes that it lacks a statistically representative sample of
comparable property, it may use other evidence to determine the appropriate
equalization ratio.”); Philbin, 156 Vt. at 641, 588 A.2d at 1061
(although factfinder is normally limited to comparing properties in the same
class as that of taxpayer’s property, “where the Board concludes that it lacks
evidence of a statistically representative sample,” it may use evidence of
other classes). 







¶ 
20.      
Indeed,
we have stated that because “property taxation rests on notions of equity and
fairness, there is no better evidence than the average equalization ratio for
all property within the Town” when the factfinder must look elsewhere for
evidence of a proper ER.  Vt. Elec. Power Co., 158 Vt. at 374, 611 A.2d
at 392.  At the same time, we have also cautioned that the factfinder should
not, “without adequate justification, throw out the proffered comparables and
use the tax department’s average ratio in every case.”  Knollwood Bldg.
Condos. v. Town of Rutland, 166 Vt. 529, 540, 699 A.2d 31, 39 (1997); see
also Alexander v. Town of Barton, 152 Vt. 148, 154, 565 A.2d 1294, 1297
(1989) (citing New England Power Co. and stating that “except in the
rare case,” § 4467 limits factfinder to looking at comparable properties
to determine if differences exist between listed value and FMV, and that use of
townwide ratio is justified by need to give unique property owners some
recourse for unfair listing).

¶ 
21.      
Finally,
we have recognized that while the approach described above is the “most common
equalization method, the law does not require the use of a single method of
equalization,” Allen, 2004 VT 51, ¶ 9, nor will this Court dictate how
equalization should be accomplished.  Philbin, 156 Vt. at 640, 588 A.2d
at 1061 (citation omitted) (stating that this Court will not dictate how
equalization should be done).  Thus, in Philbin, we recognized that “[i]n
considering whether or not a particular assessment is lacking in uniformity, .
. . a property owner, the taxing authority and the courts may rely on any
relevant evidence” and “the description of the class, the determination of
which properties fit that class, or the use of other evidence where the
[factfinder] concludes that it lacks evidence of a statistically representative
sample under § 4467 are all matters that are within the sound discretion of the
[factfinder].”  156 Vt. at 641, 588 A.2d at 1061 (citation omitted).  







¶ 
22.      
With
these principles in mind, we consider taxpayers’ assertion that the superior
court erred in the first appeal by looking to sales of all property in
the town to calculate an ER, rather than adopting one of the ERs developed by
Mr. Vickery, which relied upon the sales of selected “comparable” properties. 
According to taxpayers, the use of a town-wide ratio was inappropriate because
(1) there was no finding of unique circumstances sufficient to overcome the
presumption of equalization to properties within the same class as taxpayers’
property; and (2) the town-wide ratio included dissimilar properties in
categories that were not appreciating at a rate similar to taxpayers’ property.[5]

¶ 
23.      
These
arguments are not convincing.  The superior court was unpersuaded by taxpayers’ 
evidence, finding their expert inconsistent in his calculation and application
of proper ERs.  Given its conclusion, amply supported by the record, the court
acted well within its discretion in looking to all property sales within the
town to ensure that taxpayers were not paying a disproportionate share of the
town’s tax burden. 

¶ 
24.      
The
record shows that at trial, taxpayers presented evidence in support of several
different ERs, each derived from the sales of selected residential properties
culled from the 2003 PVR study (reflecting sales between April 1, 2000 to April
1, 2003).  In calculating his ERs, taxpayers’ expert excluded condominium sales,
mobile home sales, and commercial sales because he believed that these
properties were not experiencing the same 12% annual inflation as other
residential properties in the town.







¶ 
25.      
Mr.
Vickery’s first proposed ER was 59.85% based on a comparison of the FMV and
listed value of fifteen R2 and V2 properties over a three-year period, adjusted
for time from the midpoint of the state study (October 1, 2001).  To adjust for
the passage of time, Mr. Vickery increased the sales price of each category by
6%, then divided that value into the assessed value.  His first ER was thereby
reduced from 63.45% to 59.85%.  Mr. Vickery also calculated an ER of 66.35% by
expanding the sample size to include sales from the R1 and V1 categories over
the same three-year period, with the exception of those types of sales noted
above, for a total of sixty-four sales.  This ratio similarly reflected a time
adjustment of 6%.  Mr. Vickery testified that if he had to choose between the
two ERs that he developed, he would opt for the 66.35% ratio because it was
derived from a larger sample of sales.

¶ 
26.      
Mr.
Vickery acknowledged that he took a different approach to calculating an ER in
the underlying grievance to the town listers and before the BCA.  In the
proceeding before the listers, Mr. Vickery did include condominiums,
mobile homes, commercial properties, and property that fell within the
miscellaneous category (including open land sales) in his calculation.  He did
not adjust this ratio for time.  Shortly thereafter, appearing before the BCA,
Mr. Vickery took a different approach, offering a higher estimate of FMV and a
lower ER, with the end result being approximately the same listed value that he
had advocated before the listers.  In arriving at his proposed ER of 65.17%
before the BCA, Mr. Vickery looked to sales in categories “most similar” to
taxpayers’ property—R1, R2, V1, and V2—that occurred between April 1, 2001 and
April 1, 2002.  He did not adjust these sales for time.  As in the proceedings
before the superior court, Mr. Vickery excluded certain categories of sales
within the residential classifications; he also excluded several residential
sales that he considered to be extreme or outliers because their FMV equaled or
exceeded their listed value, despite the fact that these sales were not
excluded from the state study on this basis.  Mr. Vickery acknowledged that all
of the sales that he excluded were equal to or higher than the ratios of the
sales that he had included in his study, and that had they been included, the
result would have been a higher ER.[6]  







¶ 
27.      
Notwithstanding
these varied approaches taken by their expert, taxpayers argue that the
superior court was nonetheless obligated to accept one of their proposed ERs
simply because they considered the sales of comparable properties in arriving
at their ratios.  This position is without merit.  Surely in light of the
evidence described above, the court was justified in concluding that Mr.
Vickery was not consistent in his calculation and application of proper ERs. 
Indeed, we note that Mr. Vickery’s approach, and his exclusion of certain
sales, is also inconsistent with our cases holding that all property
within the same class is considered “comparable” for purposes of § 4467,
not just property that is appreciating at the same rate.  See Philbin,
156 Vt. at 640, 588 A.2d at 1061 (explaining that if class of comparable
properties considered for equalization purposes is unduly narrowed, it leaves “little
likelihood that the average of the ratios of the properties is equal or close
to the average of all ratios or the average of the ratios for properties within
the class” (citing Bowen, 153 Vt. at 136, 569 A.2d at 454 (Dooley, J.,
concurring))); see also Couse v. Town of Leicester, 156 Vt. 570, 571-72,
593 A.2d 473, 474 (1991) (emphasizing that the comparison of comparables should
be achieved by using the “largest and fairest possible sampling of comparable
properties,” and remanding where Board failed to include eleven relevant
comparables in calculating its ER).  The superior court did not err in
rejecting taxpayers’ evidence and looking instead to the town-wide ratio.







¶ 
28.      
This
leads us to the question of whether the application of an ER derived from three
years of sales, as opposed to one derived from one year of sales, provides the
most accurate equalization ratio.  As noted above, the superior court used the
2001 CLA to equalize the April 1, 2002 FMV of taxpayers’ property.  In
contrast, the state appraiser found that because there was evidence of rapid
appreciation within the town, a one-year average closest in time to the
appraisal date provided the most accurate ratio.  We agree with the state
appraiser’s approach, and thus conclude that where evidence is presented
showing a steep rate of appreciation, the most accurate ER is determined by
looking at sales closest in time to the appraisal date—whether one year prior
to the appraisal date or six months before and after the appraisal date—unless
the trier of fact is persuaded by the evidence that such an approach is unfair,
flawed, or otherwise inappropriate. 

¶ 
29.      
The
appraiser applied an ER of 47.8% based on fifty-nine sales in all property
categories in the year prior to April 1, 2005, adjusted for time at the rate of
1.0% per month.  The Town argues that the appraiser erred in applying such an
approach, maintaining that the appraiser should have applied the unadulterated
2004 CLA of 70.16%.  It offers a variety of arguments as to why this value was
more appropriate, focusing on the consistency and reliability of this value as
well as the legal reality of a statewide educational property tax scheme and
the broad-based equity achieved by using this approach.  According to the Town,
the state appraiser’s rejection of its approach was not sufficiently
explained.  Turning to the ER actually employed by the appraiser, the Town
questions the appraiser’s reliance on regulations related to valuation of
subsidized housing.  It argues that the appraiser’s ER was erroneously derived
and that his methodology was neither predictable nor consistent with his
obligation to ensure an equitable assessed value.  The Town also asserts that
the appraiser failed to explain why a time adjustment rendered its ER more
reliable.

¶ 
30.      
With
one exception, we reject these arguments.  The state appraiser has wide
discretion in calculating an appropriate ER, and he was not required to adopt
the Town’s approach.  Nor was the appraiser obligated to explain in detail why
he was not persuaded by the Town’s position.  Monti, 135 Vt. at 101, 369 A.2d at 1377; see also Knollwood, 166 Vt. at 547, 699 A.2d at 43
(rejecting taxpayers’ argument that factfinder’s reasons for rejecting the ER
proposed by its expert were erroneous, concluding that “the matter lies within
the [factfinder]’s discretion in evaluating the evidence before it”).   







¶ 
31.      
Whatever
the relevance of the subsidized housing regulations to property-tax appeals
generally, we find no error in the state appraiser’s conclusion that the most
relevant data in this case was derived from a study of sales within one year of
the appraisal date.  As reflected in his decision, the appraiser was persuaded
by taxpayers’ expert that home values were rapidly rising in the town, and
thus, that recent data provided a more reliable and accurate ER.  It is for the
appraiser, as the trier of fact, to weigh the evidence, and we find the reasons
underlying the appraiser’s decision to use sales occurring one year before the
appraisal date sufficiently explained.  

¶ 
32.      
We
agree with the Town, however, that the appraiser failed to explain why a
time-adjustment of 1% per month rendered this value even more precise.  It is
not apparent from the record why a time-adjustment of all sales in all
property classes—despite presumably very different rates of appreciation across
classes—resulted in a more accurate ER.  Indeed, Mr. Vickery relied on the
different appreciation rates of property within the town—albeit
inconsistently—as the rationale for excluding certain classes of property from
his calculation of an ER in the superior court proceedings.  See supra
¶¶ 22-24.  In the proceedings before the state appraiser, Mr. Vickery also
excluded certain classes of property from his calculation of an ER, and thus,
the time adjustment he employed in his study applied only to the residential properties
he selected, not to all property sales within a one-year period.  Because we
cannot discern from the record precisely how the appraiser implemented the time
adjustment or why its application to all classes of property renders the ER
more accurate, we remand for additional findings.  







¶ 
33.      
We
agree with the Town that the use of the town-wide CLA has many of the
advantages that it describes.  It is not subject to manipulation, and it offers
consistency, reliability and broad-based equity town-wide.  And in fact, the
appraiser applied a ratio derived from the town-wide CLA in this case.  We
cannot conclude, however, that, as a matter of law, the appraiser’s use of data
from the state study, reflecting fifty-nine sales taken from the year closest
in time to the appraisal date, must be considered less reliable than a
three-year average ratio that includes sales dating back to 2002, particularly
given the evidence of rapid appreciation within the town.  Although a
three-year average ratio is used for purposes of ascertaining the statewide
education tax, it does not necessarily follow that such an average best ensures
that the listed value of taxpayers’ property corresponds to the listed value of
comparable properties within the town as required by 32 V.S.A. § 4467.  

¶ 
34.      
We
recognize the potential inconsistency that may occur depending on the timing of
property-tax appeals within a town and the availability of yearly statewide
data.  But we conclude that this is a question of general concern for the
Legislature to resolve.  On the facts of this case, we find no abuse of
discretion. 

¶ 
35.      
As
noted above, in the first appeal, the superior court applied an ER derived from
a three-year study of sales.  Because there was evidence presented to the
superior court that residential property in the town was experiencing a
similarly rapid rate of appreciation prior to April 1, 2002, it appears that
the most accurate ER would be derived from all sales, adjusted for time if
appropriate, occurring in the year prior to—or the six-month period before and
after—the April 1, 2002 appraisal date.  We therefore reverse and remand for
the application of such an ER, subject to any arguments that might be raised as
to why such an ER is inappropriate on the facts of this case.

            The
superior court’s decision as to the 2002 listed value of taxpayers’ property is
reversed and remanded; the appraiser’s decision as to the 2005 listed value of
taxpayers’ property is remanded for additional findings on whether a time
adjustment is appropriate.

 

FOR THE
COURT:

 

_______________________________________

Associate Justice





[1]  Each year, the Department of Taxes
conducts an “equalization” study, the purpose of which is to estimate the full
fair market value of all property that is taxable for education purposes and to
determine the level of assessment equity (coefficient of dispersion).  See
Introduction to Vermont’s Equalization Study, Vermont Dep’t of Taxes, Division
of Property Valuation and Review (Dec. 2004), available at
http://www.state.vt.us/tax/pvr.shtml.  As the Department explains, the state
assesses a tax to fund education costs based on the grand lists compiled by the
listers in over 250 municipalities in the state.  While the listers are
required to list all taxable property each year at its fair market value, it is
not feasible to do so given the ever-changing real estate market and because
town-wide reappraisals are not conducted annually.  Thus, to treat all
municipalities equally, the Department must bring grand lists to fair market
value.  Fair market value is the price a property is likely to bring if sold in
the open market.  Therefore, the Department determined that deriving a ratio of
listed value to sale price on recent arms-length transactions and applying that
ratio to similar property types wouuld render a reliable estimation of the
total fair market value of the town. 

 

The Department takes the following steps
to estimate a town’s equalized value: (1) collects sales data; (2) eliminates
sales that do not represent market value; (3) stratifies the remaining sales by
grand list categories; (4) calculates listed-value-to-sales-price ratios for
all market sales; (5) determines equalization ratios that represent reliable
estimates of the divergence from 100% of fair market value; (6) applies the
resulting ratios to the grand list value for appropriate categories; and (7)
sums the resulting values.  The total, with adjustments for local agreements
and current use appraisal, is the equalized education property value for the
town.  The Department prepares a preliminary list based on property transfer
tax returns, and then works with municipalities to further refine this list. 

 

The 2001 report referenced
above was published in December 2001, and it included a study of sales between
April 1, 1998 and March 31, 2001.  We refer to this study as the “2001 study”
because it was published in December 2001, although, practically speaking, it
was not available for reference in any property-tax appeals heard during 2001. 






[2]  These are all classified as
“residential” uses.  R1 refers to “Residential 1,” R2 to “Residential 2,” V1 to
“Vacation 1,” and V2 to “Vacation 2.”  





[3]  In reaching his conclusion, the
appraiser used sales data from the 2005 PVR equalization study, finding that it
provided the most reliable evidence for determining the proper ER, as the sales
were closest in time to the April 1, 2005 appraisal date.  The appraiser
recognized, however, that in appeals considered before December 2005, there
might be no choice but to use the older data in the 2004 study.  Mindful of the
potential for disparate treatment depending on the timing of appeals, the
appraiser noted that when scheduling appeals, care needed to be taken that all
appeals in the same municipality were heard either before, or after, a new
equalization study was completed and published by PVR.  





[4]  The COD, as defined by the PVR, is the
average of the absolute deviations of each sales ratio from the median ratio,
divided by the median ratio.  See Introduction to Vermont’s Equalization Study,
Vermont Dep’t of Taxes, Division of Property Valuation and Review (Dec. 2004),
at 6.  For purposes of the state equalization study, it is a measure of
equity.  That is, it shows how fairly distributed the property tax is within a
town.  A high COD (above 20%) means that many taxpayers are paying more than
their fair share and many are paying less than their fair share.  If a town’s
COD is higher than 20%, a town is required to reappraise. 





[5]  We note that taxpayers do not challenge
the state appraiser’s use of an ER in the second appeal derived from sales in
all property categories within the town, nor do they complain in that case
about the inclusion of sales of property appreciating at different rates from
the residential property within the town.  





[6]  More specifically, Mr. Vickery
testified that, in his calculation for the BCA hearing, he removed twenty-five
sales from his original calculation, all of which had individual ERs greater
than 70%, which was higher than the ER that he was advocating to the BCA. 
Thus, Mr. Vickery removed the sales of condominiums, which as a class had an ER
of 89.56%, and would have resulted in a higher ER had they been included.  Yet
he retained open land sales in his calculation, although he stated that this
type of property was also appreciating at a different rate than residential
property.  This category of sales had a lower average ER than sales in the
residential category, which had the effect of reducing the overall ER.  As
noted above, Mr. Vickery also excluded several residential sales with
individual ERs that equaled or exceeded 100%.